PROSKAUER ROSE LLP
Attorneys for Plaintiff
Houlihan, Lokey, Howard & Zukin, Inc.
Steven M. Kayman (SK-8123)
Lloyd B. Chinn (LC-7953)
Brian S. Rauch (BR-5784)
1585 Broadway
New York, New York  10036
(212) 969-3000

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HOULIHAN, LOKEY, HOWARD & ZUKIN, INC.,

                Plaintiff,

    - against -

LORRE JAY,

                Defendant.

---

07 CV - 4782 (LTS)

Complaint

## COMPLAINT

Plaintiff Houlihan, Lokey, Howard & Zukin, Inc. ("Houlihan"), by its attorneys Proskauer Rose LLP, for its Complaint against Defendant Lorre Jay respectfully alleges as follows:

### INTRODUCTION

1.     This is an action for civil remedies, including injunctive relief and damages, under the Computer Fraud & Abuse Act of 1986, 18 U.S.C. § 1030(g), as amended, and New York State statutory and common law arising out of Defendant Jay's illegal, unauthorized and otherwise wrongful and actionable accessing, copying, transferring, trafficking, and misappropriating of an enormous quantity of confidential

and proprietary information, data and programs stored in Houlihan's computer databases and elsewhere. Although Houlihan's investigation is continuing, it appears that Jay stole virtually everything she could get her hands on which she thought might be useful in her new job competing with Houlihan.

2. Jay was a highly compensated senior manager in the valuation and financial opinions practice of Houlihan, an investment banking firm. Both prior and subsequent to announcing her intention to resign and accept an offer at Duff & Phelps, a direct competitor of Houlihan, and in blatant disregard of her fiduciary and contractual duties, Jay surreptitiously downloaded and sent via e-mail Houlihan's confidential and proprietary information to her home computer and/or personal e-mail accounts. Jay also engaged in substantial e-mail correspondence and placed or received phone calls to numerous clients prior to her departure from Houlihan in an effort to divert those clients to her own, or her new employer's, benefit while undermining Houlihan's relationship with these clients.

3. Jay also provided certain Houlihan confidential and proprietary information to Duff & Phelps.

4. In this action, Houlihan seeks temporary, preliminary and permanent injunctive relief: (a) compelling Jay to immediately return the originals and all copies of Houlihan's electronic files and other property; (b) directing the supervised destruction (so as to preserve evidence) of all data transmitted to Jay's home computer and/or e-mail accounts or loaded on Duff & Phelps's system; (c) preventing Jay from utilizing the misappropriated information or other Houliahan confidential or proprietary information in any fashion; (d) preventing Jay from soliciting or servicing Houlihan clients: (i) who were improperly solicited by Jay prior to her departure from Houlihan; (ii) who were listed in the offer letter

given to Jay by Duff & Phelps; (iii) about whom Jay misappropriated Houlihan's confidential and proprietary information; and (e) preventing Jay from soliciting any of Houlihan's New York office FAS group's employees.

5. Houlihan also seeks actual and punitive damages, the recovery of compensation paid to Jay during her period of disloyalty under the "Faithless Servant" doctrine, costs and attorney fees.

## JURISDICTION AND VENUE

6. This Court has original subject matter jurisdiction over the Federal claims asserted in this action pursuant to 28 U.S.C. § 1331 (Federal question jurisdiction).

7. This Court also has jurisdiction over this case pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000 and the dispute is between citizens of different states (diversity jurisdiction).

8. This Court also has supplemental jurisdiction over the State law claims asserted in this Complaint pursuant to 28 U.S.C. § 1367.

9. A substantial part of the events or omissions giving rise to the claims asserted in this action and a substantial part of the property that is the subject of the action, is situated in this judicial district. Accordingly, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2).

## PARTIES

10. Plaintiff Houlihan is a California corporation with its principal place of business at 1930 Century Park West, Los Angeles, CA 90067. It also maintains a substantial New York office at 245 Park Avenue, New York, NY 10167. Houlihan is an international investment bank providing a wide range of services, including financial valuations, opinions and advisory services.

11. Houlihan employed Jay from on or about February 1, 2000 until May 31, 2007. Jay, at the time of her voluntary resignation from Houlihan, was a highly compensated Director in the Financial Advisory Services ("FAS") group of Houlihan's New York office who concentrated on valuation work. Jay announced her intention to resign on May 23, 2007 to join Duff & Phelps, with her final date of Houlihan employment on May 31, 2007. Jay resides at 44 Brookhollow Lane, Stamford, CT 06902.

## STATEMENT OF FACTS

12. As a Director in Houlihan's FAS group, Houlihan vested Jay with significant client relationship responsibilities.

13. During her last period of employment, which lasted fifteen months because of a change in Houlihan's fiscal calendar, Jay received compensation of $684,270 in cash, $10,917 in stock, and $67,813 in deferred compensation subject to future vesting. As of April 1, 2007, Houlihan paid Jay an annual salary of $170,000 payable monthly at the end of each month. On April 30, 2007, Houlihan paid to Jay a cash bonus of $353,739 and Jay vested in stock with a value of $10,917.

14. On February 6, 2000, in conjunction with the commencement of her employment with Houlihan, Jay executed a Proprietary Information and Developments Agreement providing, in relevant part:

> (1) Proprietary Information. For purposes of this Agreement, "Proprietary Information" means information that (a) is not known by actual or potential competitors of the Company or is generally unavailable to the public, (b) has been created, discovered or developed by, or otherwise become known to, the Company (including confidential

information regarding the Company's clients or prospective clients) or in which property rights have been assigned or otherwise conveyed to the Company, and/or (c) has material economic value or potential material economic value to the Company's present or future business....

(2) <u>Nondisclosure of Proprietary Information</u>. At all times, both during my employment and after the cessation of my employment, whether the cessation is voluntary or involuntary, I shall (a) keep in confidence all Proprietary Information, and (b) not disclose or use, or assist in the use or disclosure of, any Proprietary Information, except as may be necessary in the legitimate and ordinary course of performing my duties as an employee of the Company, without the Company's prior written consent.

(3) <u>Confidential Information of Third parties</u>. The Company has received, and in the future will receive, confidential or proprietary information from or regarding the Company's clients, prospective clients and other third parties, subject to the Company's duty to maintain the confidentiality of such information and to use it only for certain limited purposes. In connection therewith, I shall not disclose or use, or assist in the use or disclosure of, any such confidential or proprietary information without the Company's prior written consent, except as may be necessary in the legitimate and ordinary course of performing my duties as an employee of the Company, but nevertheless consistent with the Company's agreement to maintain the confidentiality of such information....

(4) <u>Conflicting Employment; Business Opportunities</u>. During my employment, I shall... (b) promptly disclose to the Company all business opportunities that are (i) presented to me in my capacity as an officer or employee of the Company, and (ii) of a similar nature to the Company's existing business or a type of business the Company is currently developing, and (c) not usurp or take advantage of any such business opportunity without first offering such opportunity to the Company....

(5) <u>Termination of Employment</u>. Upon termination of my employment for whatever reason, I shall neither take nor allow a third party to take, and I shall deliver to the Company, all original copies and all reproductions of all Proprietary Information, including, without limitation, all records, reports, notebooks, proposals, client lists,

    correspondence, documents, computer diskettes, notes,
    tapes or other electronic recordings, programs, data, or
    other materials or property of any nature belonging to the
    Company or pertaining to my work with the Company....
    [t]he terms and conditions of this Agreement shall continue
    to apply after termination of my employment....

    (6) <u>Injunctive Relief; Attorneys' Fees</u>. If I breach (or
    threaten to breach) this Agreement, the Company shall be
    entitled to enjoin such breach and, in furtherance thereof,
    an injunction may be granted by any court of competent
    jurisdiction. If either party to this Agreement brings an
    action to enforce the terms hereof or declare rights
    hereunder, the prevailing party in any such action shall be
    entitled to recover its, his or her reasonable attorneys' fees
    from the other party as fixed by the Court.

  15.  The FAS group, of which Jay was a member, services a wide-range of clients by providing valuation opinions in a non-transactional context, and financial opinions (including fairness and solvency opinions) and solvency opinions in a transactional context. Jay specialized in tax and financial reporting valuation opinions but also performed other tasks for clients.

  16.  Jay had relationship responsibility for a significant number of clients (amounting to approximately $5 million per year in revenue to Houlihan) and had a three person dedicated team working for her, as well many additional people working under her direction on specific projects.

  17.  On May 23, 2007, three weeks after receiving her bonus for the fiscal year ended March 31, 2007, Jay informed the head of the New York office of Houlihan's FAS group, Michael Fazio, that she was resigning her employment to become a Managing Director of Houlihan's competitor, Duff & Phelps. Fazio instructed Jay not to contact any clients regarding her departure, and Jay assured him that she would not do so and had not done so up to that point. Jay and Fazio agreed to work together to accomplish a

professional and cordial parting of the ways, and they agreed that Jay's last day of employment would be May 31.

18.     Upon information and belief, both prior and subsequent to her meeting with Fazio, Jay: solicited at least one Houlihan employee to go to Duff & Phelps; contacted Houlihan clients to advise them of her departure and her interim contact information; solicited Houlihan clients to divert their business to her at Duff & Phelps; diverted potential business from Houlihan; misappropriated Houlihan confidential documents relating to client information, confidential business practices and strategy; and provided Duff & Phelps with misappropriated confidential Houlihan information.

19.     On information and belief, in the days prior to her May 31, 2007 meeting with Fazio, Jay solicited an employee member of her dedicated team at Houlihan's New York office's FAS group to join her at Duff & Phelps.

20.     On information and belief, both prior and subsequent to her meeting with Fazio, Jay called many of the Houlihan clients for whom she had responsibility to inform the clients of her impending departure and to solicit them, directly or implicitly, to provide business to her at Duff & Phelps.  Jay followed up these telephone conversations with e-mails in which she confirmed the conversations and provided her interim contact information to the clients.  Jay contacted a minimum of seven Houlihan clients and, on information and belief, many more than that.

21.     On information and belief, Jay diverted or attempted to divert potential business from Houlihan to herself and to Duff & Phelps "warehousing" referrals from Houlihan referral sources until she began work at Duff & Phelps.

7

22. Houlihan discovered Jay's extensive theft of its confidential and proprietary information on or about May 24, 2007 when it examined her e-mail files on her Houlihan computer. Houlihan immediately terminated Jay's access to its computer systems and precluded her from returning to the office. Further, Houlihan's General Counsel Christopher Crain explained to Jay that Houlihan does have legal claims against her that it will pursue, although it may be willing to settle with her. The next day, May 25, Crain and Jack Berka, Senior Managing Director of Houlihan and the global head of its FAS group telephoned Jay at her home and offered to settle Houlihan's legal claims for, among other items, the supervised destruction of all Houlihan confidential information present on Jay's personal computer and/or e-mail account. They explained that the supervision of the destruction was necessary to insure that it was done properly and information was not transferred to other sources. In a May 31, 2007, letter to Jay, Houlihan's legal counsel demanded that Jay "preserve without deletion or modification of any kind all computer records containing Houlihan documents and all other relevant evidence in you possession." In an e-mail to Crain later that same day, Jay advised Houlihan that she had deleted from her computer all files relating to Houlihan.

23. Based on information available to us, since at least April 9, 2007 and continuing on a regular basis up to and including May 24, 2007, Jay e-mailed to her personal e-mail account numerous confidential and proprietary documents belonging to Houlihan including confidential information about Houlihan clients and other confidential, proprietary information. These documents included listings of Jay's projects (including client information) since January 2005, confidential valuation opinions, reports, models, retainer agreements, engagement letters, proposals, client presentations, contact information letters, Houlihan standard practices with respect to

8

almost all aspects of the FAS group's services, sample reports and studies. In all, since April 9, 2007 Jay forwarded approximately 115 business related e-mails to her personal e-mail. These e-mails included approximately 378 confidential Houlihan documents.

24. One of the documents Houlihan recovered from the Houlihan computer used by Jay is a May 22, 2007 offer letter from Duff & Phelps to Jay. It contains, as an attachment, a list of twenty-six Houlihan clients. These twenty-six clients represent the majority of the Houlihan clients for whom Jay had primary responsibility in her last year with Houlihan. When Jay commenced her Houlihan employment, she did not "bring" any of these listed clients to Houlihan. Although Jay had primary responsibility for the clients on this list at the time she resigned from Houlihan, most had been referred to her by other Houlihan employees. The twenty-six clients on this list represented approximately $2.4 million in revenue to Houlihan in the last year. Although this list of Houlihan clients was confidential and proprietary to Houlihan, Jay gave it to Duff & Phelps, which accepted it and attached it to Jay's offer letter. Upon information and belief, Jay has disclosed other information about Houlihan's clients to Duff & Phelps.

## COUNT ONE
**(Violations of Computer Fraud and Abuse Act, 18 U.S.C. § 1030)**

25. Houlihan repeats and realleges paragraphs 1 through 24 as if fully set forth herein.

26. In violation of 18 U.S.C. § 1030(a)(4), Jay intentionally accessed Houlihan's computer system and downloaded confidential and proprietary information contained on that system.

27. By downloading confidential information for the purpose of competing with Houlihan and in breach of her duty of loyalty to Houlihan, Jay was accessing

9

Houlihan's computer system without authorization and was exceeding the scope of her authorization in violation of 8 U.S.C. § 1030(a)(4).

28. Moreover, in violation of 18 U.S.C. § 1030(a)(5)(A)(ii), Jay's unauthorized actions have caused damage to Houlihan and impaired the integrity of Houlihan's computer system and of the purloined confidential data through its unauthorized use and disclosure by Jay.

29. Houlihan has suffered a loss in excess of $5,000 as a result.

## COUNT TWO
### (Misappropriation of Confidential and Proprietary Information)

30. Houlihan repeats and realleges paragraphs 1 through 29 as if fully set forth herein.

31. Houlihan maintained confidential client files and related material relevant to its business operations which are critical to its ability to service its clients.

32. Jay would not have gained access to Houlihan's confidential and proprietary information without having been employed by Houlihan.

33. This material and information was created for the sole use and benefit of Houlihan, was kept strictly confidential, was never disclosed to the general public by Houlihan, and constitutes confidential material and proprietary information solely owned, developed, and controlled by Houlihan.

34. Prior to her resignation from Houlihan, Jay misappropriated extensive Houlihan confidential and proprietary information and client documents. This misappropriation was carried out by Jay e-mailing confidential and proprietary client documents to her personal e-mail account.

35. Jay was not given permission to remove any of the confidential and proprietary information created by Houlihan from its offices.

36. On information and belief, Jay has used, and/or intends to use, the confidential and proprietary information she misappropriated from Houlihan for the benefit of herself and to the detriment of Houlihan.

37. Jay's misappropriation was malicious, intentional, reckless, wanton, and willful.

38. Jay's continued possession, use, and exploitation of the confidential and proprietary information created by Houlihan has caused, and will continue to cause, Houlihan immediate and irreparable harm and economic damage.

39. Houlihan has no adequate remedy at law.

## COUNT THREE
### (Breach of Duty of Fiduciary Duty and Duty of Loyalty)

40. Houlihan repeats and realleges paragraphs 1 through 39 as if fully set forth herein.

41. During the time she was employed by Houlihan, Jay had a fiduciary duty and a duty of undivided loyalty and good faith to Houlihan. This duty included an obligation to put Houlihan's business interests above her own and an obligation to refrain from taking any action that would be inimical to Houlihan's business interests.

42. After her resignation from Houlihan, Jay had certain continuing fiduciary obligations to Houlihan, including a duty not to use confidential information she obtained during the course of her employment with Houlihan to compete with Houlihan.

43. Both before and after her resignation from Houlihan, Jay breached her fiduciary duty and duty of loyalty by directly or indirectly soliciting Houlihan's clients to

11

induce them to remove some or all of their business from Houlihan and move some or all of their business to Duff & Phelps.

44. Jay also breached her fiduciary duty and duty of loyalty by misappropriating Houlihan proprietary and confidential information for her own benefit and the benefit of Duff & Phelps, a competing business.

45. Jay's breaches of her fiduciary duty and duty of loyalty have caused and will continue to cause Houlihan to suffer immediate and irreparable injury and financial harm.

46. Jay's breaches of her fiduciary duty and duty of loyalty were malicious, intentional, reckless, wanton, and willful.

47. Houlihan has no adequate remedy at law.

## COUNT FOUR
### (Breach of Contract)

48. Houlihan repeats and realleges paragraphs 1 through 47 as if fully set forth herein.

49. On January 6, 2000, Jay executed a Proprietary Information and Developments Agreement with Houlihan providing, in summary, that Jay was to have access to proprietary and confidential information of Houlihan and certain third parties, that she agreed to keep such information confidential and that she agreed to use it only for the benefit of Houlihan. Further, she agreed not to use or disclose any confidential information of Houlihan and certain third parties for the benefit of herself or any other person or entity. She further agreed to promptly disclose all relevant business opportunities to the company. In addition, Jay expressly agreed to return to Houlihan all property belonging to it or pertaining to her work for Houlihan upon the termination of

her employment. Jay also promised not to take any proprietary information with her upon leaving Houlihan's employ.

50. Jay breached her obligations under the Proprietary Information and Developments Agreement by transferring Houlihan's confidential and proprietary information – including strategy and client information – to her own personal computer and/or e-mail account, and by sharing certain of such information with a competitor, Duff & Phelps.

51. Jay further breached her obligations by, on information and belief, by becoming aware of business opportunities in the course of her employment with Houlihan and diverting, or attempting to divert, these business opportunities away from Houlihan and to the benefit of herself and Duff & Phelps. Upon information and belief, Jay never informed anyone at Houlihan of these business opportunities.

52. Houlihan has already sustained damages as a result of such breaches by, *inter alia*, the improper disclosure and use of its confidential information.

53. Jay's actions have caused, and will continue to cause, Houlihan immediate and irreparable harm and economic damage.

54. Houlihan has no adequate remedy at law.

55. Moreover, under the Proprietary Information and Developments Agreement, Houlihan is entitled to its attorney fees if and when it prevails in this action.

## COUNT FIVE
(Conversion)

56. Houlihan repeats and realleges paragraphs 1 through 55 as if fully set forth herein.

57. At all times Houlihan was, and still is, entitled to the exclusive possession of its confidential and proprietary information, and all physical embodiments thereof, including electronic and hard copy documents as alleged above.

58. On information and belief, Jay took and/or misappropriated Houlihan's confidential and proprietary information from Houlihan and converted this information for her own benefit.

59. Jay's actions have caused, and will continue to cause, Houlihan immediate and irreparable harm and economic damage.

60. Houlihan has no adequate remedy at law.

## COUNT SIX
### (Return of Compensation in Accordance with the Faithless Servant Doctrine)

61. Houlihan repeats and realleges paragraphs 1 through 60 as if fully set forth herein.

62. As set forth above, Jay breached her fiduciary duty and duty of loyalty to Houlihan beginning at the latest April 9, 2007 (it not earlier), when she apparently began misappropriating confidential and proprietary information.

63. Pursuant to the Faithless Servant doctrine, Jay has forfeited her right to compensation received subsequent to approximately April 9, 2007, as a result of her disloyalty to Houlihan.

64. Houlihan is entitled to return of all compensation paid to Jay after April 9, 2007, including her monthly salary that was paid on April 30, 2007 and May 31, 2007 and her bonus (including cash and stock) that was paid on April 30, 2007.

## COUNT SEVEN
### (Misappropriation of Corporate Opportunity)

65.     Houlihan repeats and realleges paragraphs 1 through 64 as if fully set forth herein.

66.     Upon Information and belief, in the course of her employment at Houlihan, Jay became aware of business opportunities and diverted, or attempted to divert, these business opportunities away from Houlihan and to the benefit of herself and Duff & Phelps. Jay has not notified Houlihan of these opportunities.

67.     Houlihan is and has always been able to undertake the diverted work, as, upon information and belief, the work involved valuations which are a regular aspect of the services that Houlihan performs for its clients.

68.     Jay has, on information and belief, wrongfully diverted these corporate opportunities -- which belong to Houlihan -- to herself and Duff & Phelps.

69.     Jay's actions have caused, and will continue to cause, Houlihan immediate and irreparable harm and economic damage.

70.     Houlihan has no adequate remedy at law.

**WHEREFORE**, Houlihan respectfully requests that the Court:

1.     Enter an order requiring Jay to immediately return to Houlihan all copies of Houlihan's electronic files and other property in her possession.

2.     Enter an order directing the supervised destruction of all data transmitted to Jay's home computer and/or personal e-mail accounts or loaded on Duff & Phelps's system.

3.     Enter a temporary, preliminary and permanent injunction preventing Jay from using or disclosing Houlihan's confidential and proprietary information in any fashion.

4. Enter a temporary, preliminary and permanent injunction preventing Jay from directly or indirectly soliciting or servicing Houlihan clients: (i) who were improperly solicited by Jay prior to her departure from Houlihan; (ii) who were listed in the offer letter given to Jay by Duff & Phelps; (iii) about whom she misappropriated Houlihan's confidential and proprietary information.

5. Enter a temporary, preliminary and permanent injunction preventing Jay from any solicitation of Houlihan's New York office FAS group's employees.

6. Require the disgorgement of all compensation and benefits Houlihan paid to Jay during the period in which she was in breach of her fiduciary duty and duty of loyalty owed to Houlihan.

7. Grant Houlihan judgment against Jay for compensatory, incidental and other actual damages in amounts to be determined, together with pre-judgment interest.

8. Award punitive or exemplary damages in an amount sufficient to punish Jay and satisfy the jurisprudential goals of specific and general deterrence.

9. Grant Houlihan judgment against Jay for all costs, attorneys' fees and other litigation expenses to the extent recoverable under applicable law and the Proprietary Information and Developments Agreement entered into between Jay and Houlihan.

10. Grant Houlihan such other and further relief as the Court deems just, equitable and proper.

Plaintiff demands a jury on all issues so triable.

Dated: June 5, 2007

                              PROSKAUER ROSE LLP
                              *Attorneys for Plaintiff*
                              *Houlihan, Lokey, Howard & Zukin, Inc.*

By: /s/ Steven M. Kayman
            Steven M. Kayman
            Lloyd B. Chinn
            Brian S. Rauch
1585 Broadway
New York, NY 10036
Tel.: 212.969.3000
Fax: 212.969.2900