UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HOULIHAN, LOKEY, HOWARD & ZUKIN,
INC.,

                  Plaintiff,

      - against -

LORRE JAY,

               Defendant.

07 CV - 4782 (LTS)

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

PROSKAUER ROSE LLP
Attorneys for Plaintiff
Houlihan, Lokey, Howard & Zukin, Inc.
Steven M. Kayman (SK-8123)
Lloyd B. Chinn (LC-7953)
Brian S. Rauch (BR-5784)
1585 Broadway
New York, New York 10036
(212) 969-3000

June 5, 2007

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ...................................................................................................................... 4

POINT I. HOULIHAN IS ENTITLED TO TEMPORARY AND PRELIMINARY
INJUNCTIVE RELIEF ....................................................................................................... 4

   A.   Houlihan Is Likely To Succeed On The Merits Of Its Claims. .......................................... 5

      1.   Houlihan Is Likely To Succeed On The Merits Of Its Computer Fraud And Abuse Act
Claim. ................................................................................................................................. 5

      2.   Houlihan Is Likely To Succeed On Its Contract Claim. ................................................. 8

      3.   Houlihan Is Likely To Succeed On Its Breach Of Duty of Loyalty/Breach of Fiduciary
Duty Claim. ........................................................................................................................ 9

      4.   Houlihan Is Likely To Succeed On Its Misappropriation of Confidential and
Proprietary Information Claim. ......................................................................................... 11

      5.   Houlihan Is Likely To Succeed On Its Conversion Claim. ........................................... 13

      6.   Houlihan Is Likely To Succeed On Its Misappropriation of Corporate Opportunity
Claim. ............................................................................................................................... 13

   B.   Absent Injunctive Relief, Houlihan Will Be Irreparably Harmed. ................................... 14

   C.   The Balance of Hardships Tips Decidedly in Plaintiff's Favor. ........................................ 16

POINT II. HOULIHAN MUST CONDUCT EXPEDITED DISCOVERY TO AVOID
FURTHER AND PROLONGED IRREPARABLE INJURY ....................................................... 17

CONCLUSION ................................................................................................................... 19

i

## TABLE OF AUTHORITIES

### CASES

Abraham Zion Corp. v. Lebow,
    593 F. Supp. 551 (S.D.N.Y. 1984) (Motley, J.), aff'd,
    761 F.2d 93 (2d Cir. 1985)...................................................................10

Advanced Portfolio Tech., Inc. v. Advanced Portfolio Tech Ltd.,
    No. 94 Civ. 5620, 1994 WL 719696 (S.D.N.Y. Dec. 28, 1994).........................17, 18

Alexander & Alexander, Inc. v. Fritzen,
    147 A.D.2d 241, 542 N.Y.S.2d 530 (1st Dep't 1989)........................................13, 14

Am. Fed. Group v. Rothenberg,
    136 F.3d 897 (2d Cir. 1998)...................................................................10

Brass v. Am. Film Techs., Inc.,
    780 F. Supp. 1001 (S.D.N.Y.1991) (Freeh, J.) ..............................................13

Bro-Tech Corp. v. Thermax, Inc., No. Civ. A. 05-2330,
    No. Civ. A. 05-2330, 2006 WL 516767 (E.D. Pa. Feb. 28, 2006) ............................6

Burg v. Horn,
    380 F.2d 897 (2d Cir. 1967)....................................................................13

Computer Assoc. Int'l. Inc. v. Bryan,
    784 F. Supp. 982 (E.D.N.Y. 1992) (Spatt, J.)............................................15, 16

DoubleClick v. Henderson,
    No. 116914/97, 1997 WL 731413 (Sup Ct. New York County Nov. 7, 1977). .....................10

EF Cultural Travel BV v. Explorica, Inc.,
    274 F.3d 577 (1st Cir. 2001).....................................................................6

Estee Lauder Cos. v. Batra,
    430 F. Supp. 2d 158 (S.D.N.Y. 2006) (Sweet, J.).......................................14, 15

FMC Corp. v. Taiwan Tainan Giant Indus. Co.,
    730 F.2d 61 (2d Cir. 1984).....................................................................15

Herrera v. Clipper Group, L.P.,
    No. 97 560 (SAS)/87 Civ. 561,
    1998 WL 229499 (S.D.N.Y. May 6, 1998) (Scheindlin, J.) ...................................10

Howard v. Carr,
    222 A.D.2d 843, 635 N.Y.S.2d 326 (3d Dep't 1995)................................................................10

Hudson Hotels Corp. v. Choice Hotels Int'l,
    995 F.2d 1173 (2d Cir. 1993)........................................................................................................11

Inflight Newspapers, Inc. v Magazines In-Flight LLC,
    990 F. Supp. 119 (E.D.N.Y. 1997) (Seybert, J.)......................................................................15

Int'l Airport Ctrs., L.L.C. v. Citrin,
    440 F.3d 418 (7th Cir. 2006) ...................................................................................................6, 7

Ivy Mar Co. v. C.R. Seasons, Ltd.,
    907 F. Supp. 547 (E.D.N.Y. 1995) (Block, J.).........................................................................11

Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,
    596 F.2d 70 (2d Cir. 1979)...........................................................................................................4

Lamdin v. Broadway Surface Adver. Corp.,
    272 N.Y. 133 (1936) ...................................................................................................................10

Leon M. Reimer & Co., P.C. v. Cipolla,
    929 F. Supp. 154 (S.D.N.Y. 1996) (Parker, J.) ......................................................................10

Lumex, Inc. v. Highsmith,
    919 F. Supp. 624 (E.D.N.Y. 1996) (Spatt, J.)....................................................................14, 15

Maritime Fish Prods., Inc. v. World-Wide Fish Prods., Inc.,
    100 A.D.2d 81, 474 N.Y.S.2d 281 (1st Dep't) appeal dismissed,
    63 N.Y.2d 675 (1984) .................................................................................................................10

Merrill Lynch v. Napolitano,
    85 F. Supp. 2d 491 (E.D. Pa. 2000) .........................................................................................16

Merrill Lynch v. Ran,
    67 F. Supp. 2d 764 (E.D. Mich. 1999)......................................................................................16

Otokoyama Co. v. Wine of Japan Import, Inc.,
    175 F.3d 266 (2d Cir. 1999).........................................................................................................4

Pac. Aerospace & Elecs., Inc. v. Taylor,
    295 F. Supp. 2d 1188 (E.D. Wash. 2003) ...............................................................................6, 7

PepsiCo, Inc. v. Redmond,
    54 F.3d 1263 (7th Cir. 1995) .............................................  ...........................................14, 15

Shurgard Storage Ctrs. v. Safeguard Self Storage, Inc.,
   119 F. Supp. 2d 1121 (W.D. Wash. 2000) ........................................................5, 6, 7, 8

Softel, Inc. v. Dragon Med. & Scientific Commcns, Inc.,
   118 F.3d 955 (2d Cir.1997) ..........................................................................................11

Twentieth Century Fox Film Corp. v. Mow Trading Corp.,
   749 F. Supp. 473 (S.D.N.Y. 1990) (Kram, J.) ..............................................................17

United States v. Czubinski,
   106 F.3d 1069 (1st Cir. 1997) ........................................................................................5

Vigilant Ins. Co. of Am. v. Hous. Auth. of El Paso, Texas,
   87 N.Y.2d 36, 637 N.Y.S.2d 342 (1995) ......................................................................13

## STATUTES

18 U.S.C. § 1030 ..............................................................................................................3

18 U.S.C. § 1030(a)(4) ......................................................................................................5

18 U.S.C. § 1030(a)(5)(A)(ii) ...........................................................................................5

18 U.S.C. § 1030(a)(5)(B)(i) .............................................................................................5

18 U.S.C. § 1030(a)(5)(B)(iii) ..........................................................................................6

18 U.S.C. § 1030(g) ..........................................................................................................6

18 U.S.C. § 1030(e)(8) ......................................................................................................6

18 U.S.C. § 1030(e)(11) ....................................................................................................6

Fed. R. Civ. P. 30(b) .......................................................................................................17

Fed. R. Civ. P. 34(b) .......................................................................................................17

Fed. R. Civ. P. 65(b) .........................................................................................................5

## OTHER AUTHORITIES

Restatement of Torts § 757 cmt. b (1939) ......................................................................11

## PRELIMINARY STATEMENT

Plaintiff Houlihan, Lokey, Howard & Zukin, Inc. ("Houlihan") submits this Memorandum of Law in support of its application for a temporary restraining order, preliminary injunction and expedited discovery against Defendant Lorre Jay. Prior to her recent resignation from Houlihan's employ, Jay engaged in a variety of disloyal and unlawful acts, designed to benefit herself and her new employer at Houlihan's expense. It is those acts that are the subject of this application.

Houlihan is an international investment bank providing a wide range of services to clients, including financial valuations, opinions and advisory services. Until Jay resigned on May 23, 2007, effective May 31, she worked for Houlihan as a highly compensated Director in its Financial Advisory Services ("FAS") group.

Prior to her last day with Houlihan, Jay engaged in the following disloyal and unlawful acts:[1]

- Since at least April 9, 2007, and continuing on a regular basis up to and including May 24, 2007 (the day after announcing her resignation to join Duff & Phelps LLC, a direct competitor), Jay repeatedly and surreptitiously accessed Houlihan's computer system and e-mailed to her personal e-mail account at least 115 e-mails containing, at a minimum, 378 confidential Houlihan documents.

- These documents included listings of Jay's projects (including client identification information) since January 2005, confidential valuation opinions, reports, models, retainer agreements, proposals, client presentations, contact information letters, Houlihan standard practices with respect to almost all aspects of the FAS group's services, sample reports and studies.

- Jay engaged in substantial e-mail correspondence with and placed or received phone calls to at least seven existing Houlihan clients (and probably more) in an effort to divert those clients to her benefit and to the benefit of her soon-to-be new employer, Duff & Phelps.

---

[1]  For a more complete statement of the facts in support of this application, we respectfully refer the Court to the Declaration of Michael Fazio, submitted herewith. Of course, the facts recited are based solely on what Houlihan has been able to determine from its own investigation so far, without discovery. Many facts are within the exclusive possession of Defendant and her new employer.

- Jay solicited at least one Houlihan employee to join her once she began her new employment at Duff & Phelps.

- After announcing her resignation on May 23, Jay's superiors advised her not to contact Houlihan's existing clients regarding her departure. In response, Jay lied and said that she had not done so and would not do so prior to her departure.

- In an e-mail dated May 24, 2007 (the day after she advised Houlihan of her resignation), Jay received a lead for potential business to perform a valuation for a company – the type of valuation that Houlihan performs regularly. Without advising Houlihan of the opportunity, Jay informed the referral source that she would be interested in performing the work and provided her cell phone number, instead of her Houlihan contact number, for the potential client to contact her.

Duff & Phelps formally offered Jay a job on May 22, 2007. The offer letter – which was discovered on Houlihan's computer system – attaches a list of twenty-six Houlihan clients, which together represent the majority of the clients for whom Jay had primary responsibility during her last year with Houlihan. Although the list was confidential and proprietary to Houlihan, Jay gave it to Duff & Phelps, which accepted it and attached it to Jay's offer letter.

Houlihan discovered Jay's extensive theft of its confidential and proprietary information on May 24, 2007. Houlihan immediately terminated her access to its computer systems and told her to cease coming to the office. On May 25, 2007 Houlihan offered to resolve its legal claims against Jay for, among other things, her agreement to a supervised destruction of Houlihan's confidential information on her personal computer and/or e-mail account. Following up on this discussion, Houlihan's outside counsel sent a letter to Jay on May 31, 2007, demanding that she "preserve without deletion or modification of any kind all computer records containing Houlihan documents and all other relevant evidence in your possession." Later that day, after having been caught red-handed stealing Houlihan's confidential and proprietary information, Jay advised Houlihan by e-mail that she had destroyed the electronically stored information documenting her theft, in an apparent attempt to cover her tracks. Jay's spoliation of evidence, after being placed

2

on notice of Houlihan's legal claims and being specifically advised to <u>preserve</u> any relevant information only magnifies the need for immediate Court intervention to preserve the status quo and protect Houlihan's rights.

For purposes of this application, Houlihan clearly has demonstrated a strong likelihood of success on the merits of its claims, that it will suffer irreparable harm in the absence of injunctive relief and that the balance of harms tips decidedly in its favor.

Not surprisingly, Jay's conduct gives rise to a number of causes of action: violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030) ("CFAA"); breach of contract; breach of fiduciary duty/duty of loyalty; misappropriation of confidential and proprietary information; conversion; and misappropriation of corporate opportunity. As set forth below, based solely on the facts presently known, pre-discovery, Houlihan has a substantial likelihood of success as to each of these claims.

By this application, Houlihan seeks temporary and preliminary injunctive relief: (a) compelling Jay to return immediately the originals and all copies of Houlihan's electronic files and other property; (b) directing the supervised destruction (so as to preserve evidence) of all data transmitted to Jay's home computer and/or personal e-mail accounts or loaded on Duff & Phelps's system by Jay; (c) preventing Jay from utilizing the misappropriated information in any fashion; (d) preventing Jay from directly or indirectly soliciting or servicing Houlihan clients: (i) who were improperly solicited by Jay prior to leaving Houlihan; (ii) who were listed in the offer letter given to Jay by Duff &Phelps; (iii) about whom Jay misappropriated Houlihan's confidential and proprietary information; and (e) preventing Jay from soliciting any of Houlihan's New York office FAS group employees.

3

Items (a) through (c) merely seek what Houlihan is entitled to as a matter of basic law, a return of (and verified destruction of) its property and the preservation of evidence. Items (d) and (e) are necessary to prevent any further irreparable harm to Houlihan. In the absence of an injunction, irreparable harm to Houlihan is unavoidable, given that Jay already has (and has had) substantial quantities of Houlihan's confidential and proprietary information. At a minimum, items (d) and (e) are necessary during a period of expedited discovery so that Houlihan can learn what Jay has done with its confidential and proprietary information. Critical in this analysis is Jay's demonstrated propensity to steal and otherwise act unlawfully and to destroy evidence. Finally, if a temporary restraining order (and ultimately an injunction) is granted, the only "harm" to Jay is that of her own making (unlike Houlihan, which is only a victim here). Thus, the balance of harms tips decidedly in Houlihan's favor.

## ARGUMENT

### POINT I.

### HOULIHAN IS ENTITLED TO TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF

Preliminary injunctive relief is appropriate where the movant has shown that: (1) absent injunctive relief, it will suffer irreparable harm; and (2) either (a) it is likely to succeed on the merits of its claim or (b) there are sufficiently serious questions going to the merits of those claims to make them a fair ground for litigation, and the balance of hardships tips decidedly in its favor. See, e.g., Otokoyama Co. v. Wine of Japan Import, Inc., 175 F.3d 266, 270 (2d Cir. 1999); Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979). Further, a temporary restraining order may be granted pending a hearing for a preliminary injunction where "it clearly appears ... that immediate and irreparable injury, loss, or damage will result to the

4

applicant before the adverse party or that party's attorney can be heard in opposition." Fed. R.
Civ. P. 65(b).

In addition to the Court's power and responsibility to grant injunctive relief pursuant to
the federal rules, Jay and Houlihan have agreed contractually to permit the entry of an injunction
to address Jay's theft of confidential information and diversion of corporate opportunities.  In a
Proprietary Information and Developments Agreement dated February 6, 2000, Jay agreed as
follows: "If I breach (or threaten to breach) this Agreement, the Company shall be entitled to
enjoin such breach and, in furtherance thereof, an injunction may be granted by any court of
competent jurisdiction."

A.    **Houlihan Is Likely To Succeed On The Merits Of Its Claims.**

    1.    **Houlihan Is Likely To Succeed On The Merits Of Its Computer Fraud And
Abuse Act Claim.**

The CFAA makes it a federal crime for any person to "knowingly and with intent to
defraud, access[] a computer without authorization, or exceed[] authorized access, and by means
of such conduct further[] the intended fraud and obtain[] anything of value . . . ."  18 U.S.C. §
1030(a)(4).  "Fraud" in this context simply means "wrongdoing" or "dishonest means" and "not
proof of the common law elements of fraud." Shurgard Storage Ctrs. v. Safeguard Self Storage,
Inc., 119 F. Supp. 2d 1121, 1126 (W.D. Wash. 2000) (citing United States v. Czubinski, 106
F.3d 1069, 1078 (1st Cir. 1997)).  Moreover, under 18 U.S.C. § 1030(a)(5)(A)(ii), (B) (i),
"whoever . . . intentionally accesses a protected computer without authorization, and as a result
of such conduct, recklessly causes damage; and . . . [by such conduct causes] loss to 1 or more
persons during any 1-year period . . . aggregating at least $5,000 in value" also violates the
CFAA.

Section 1030(g) of the CFAA provides a civil cause of action for compensatory damages,

injunctive relief or other equitable relief to any "person who suffers damage or loss" by reason of

a violation of the CFAA, so long as the violation involves one of the factors set forth in, inter

alia, § 1030(a)(5)(B)(iii). "Damage" means any "impairment to the integrity or availability of

data, a program, a system, or information," and "loss" means "any reasonable cost to any victim.

. . ." 18 U.S.C. § 1030(e)(8), (11).

By intentionally accessing Houlihan's computer system and downloading confidential

and proprietary information contained on that system for use in a competing venture, Jay

violated the CFAA. EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577 (1st Cir. 2001)

(affirming employer's CFAA injunction against competitor and former employees where former

employees extracted information from former employer's computer website to the competitive

disadvantage of the former employer); Bro-Tech Corp. v. Thermax, Inc., No. Civ. A. 05-2330,

2006 WL 516767 (E.D. Pa. Feb. 28, 2006) (holding that CFAA provided a cause of action

against "employees taking confidential and proprietary information from their former employer's

computers for delivery to their new employers"); Pac. Aerospace & Elecs., Inc. v. Taylor, 295 F.

Supp. 2d 1188, 1194 (E.D. Wash. 2003) (granting injunctive relief under CFAA against

defendants who misappropriated a client list and other information to solicit work for a direct

competitor); Shurgard Storage, 119 F. Supp. 2d at 1121 (allowing CFAA claims to proceed

where employees e-mailed former employer's confidential information to competitor, thereby

engaging in "unauthorized access" under the CFAA); see also See Int'l Airport Ctrs., L.L.C. v.

Citrin, 440 F.3d 418 (7th Cir. 2006) (permitting CFAA suit to proceed against former employee

who, after quitting to compete with former employer in violation of his employment contract,

6

installed program on his company laptop that deleted all its data, including the evidence that he

had installed the program).

As one district court observed:

Companies frequently find themselves in litigation with former employees who
depart to set up shop elsewhere in competition with their former employer. Such
former employees may attempt to gain an edge for their new venture by making
use of proprietary information, such as customer lists or trade secrets, obtained
with ease of access from their former employer's computer database or
workstations that are linked together in a network. While passwords and other
electronic means can limit the unauthorized dissemination of some confidential
information, an employee who has not yet announced his departure is still able to
access confidential information and store it on a CD or floppy disk before he or
she leaves. Computers also make it easy for employees to quickly transmit
information out of the company.

Pac. Aerospace & Elecs., 295 F. Supp. 2d at 1195-96   This passage, of course, describes

precisely what Jay has done to Houlihan.

Jay unquestionably violated the CFAA. Since at least April 9, 2007, and continuing on a

regular basis up to and including May 24, 2007, Jay repeatedly accessed Houlihan's computer

system and sent to her personal e-mail account at least 115 e-mails containing, at a minimum,

378 confidential Houlihan documents. All of this was done without authorization and in direct

contravention of Jay's Proprietary Information and Developments Agreement with Houlihan.

Once Jay downloaded confidential information for the purpose of competing with Houlihan and

in breach of her contractual confidentiality obligations and fiduciary duty and duty of loyalty to

Houlihan, she was accessing Houlihan's computer system "without authorization." See Int'l

Airport Ctrs., 440 F.3d at 420-21 (holding that the defendant's "breach of his duty of loyalty

terminated his agency relationship" and "with it his authority to access the laptop, because the

only basis of his authority had been that relationship."); Shurgard, 119 F. Supp. 2d at 1124-25

(same).

Finally, Jay's actions caused "damage" to Houlihan and impaired the "integrity" of the purloined confidential data through its unauthorized use and disclosure by Jay, and Houlihan has suffered a loss far in excess of $5,000 as a result. Shurgard, 119 F. Supp. 2d at 1127 (holding that in case of collection and dissemination of confidential information from a computer system by former employees, the integrity of the data was impaired within the meaning of the CFAA notwithstanding the fact that "no data was physically changed or erased"). In addition to substantial costs of creating, storing and protecting the confidential and proprietary information that Jay has misappropriated, Houlihan has retained the computer forensics investigative firm Stroz Friedberg LLC to assess, quantify and remediate Jay's unauthorized use of Houlihan's computer system at a cost in excess of $5,000 to Houlihan.

Under the circumstances and authority just described, Houlihan is highly likely to succeed on the merits of its CFAA claim.

**2. Houlihan Is Likely To Succeed On Its Contract Claim.**

By stealing Houlihan's confidential and proprietary information and by usurping Houlihan's business opportunities, Jay has unquestionably breached her February 6, 2000 Proprietary Information and Developments Agreement with Houlihan.

Contrary to the express terms of the agreement – in which Jay promised that she would "not disclose or use, or assist in the use or disclosure of, any such confidential or proprietary information[2] without the Company's prior written consent, except as may be necessary in the

---

[2] The information that Jay stole indisputably came within the agreement's definition of proprietary information. Under the agreement, " 'Proprietary Information' " means information that (a) is not known by actual or potential competitors of the Company or is generally unavailable to the public, (b) has been created, discovered or developed by, or otherwise become known to, the Company (including confidential information regarding the Company's clients or prospective clients) or in which property rights have been assigned or otherwise conveyed to the Company, and/or (c) has material economic value or potential material economic value to the Company's present or future business. . . ." As set forth below under the discussion of misappropriation of confidential and proprietary information, the materials stolen by Jay satisfy these criteria.

8

legitimate and ordinary course of performing my duties as an employee of the Company" – she stole hundreds of confidential and proprietary Houlihan documents between, at least, April 9 and May 24, 2007. Jay did not obtain Houlihan's permission to send these confidential documents to her home computer. And she did not do so in the legitimate or ordinary course of performing her duties for Houlihan. Indeed, that Jay sent these e-mails just before and after announcing her resignation from Houlihan undermines any claim now that she sent these e-mails in the ordinary course of business.

Jay also promised, in the Proprietary Information and Developments Agreement, that she would "(b) promptly disclose to the Company all business opportunities that are (i) presented to me in my capacity as an officer or employee of the Company, and (ii) of a similar nature to the Company's existing business or a type of business the Company is currently developing, and (c) not usurp or take advantage of any such business opportunity without first offering such opportunity to the Company." On at least one occasion Jay violated this provision. In an e-mail dated May 24, 2007 (the day after she advised Houlihan of her resignation), Jay received a lead for potential business to perform a transaction valuation for a company – the type of valuation that Houlihan performs regularly. Without advising Houlihan of the opportunity, Jay informed the referral source that she would be interested and provided her cell phone number for the potential to client to contact her, instead of her Houlihan contact number.

Houlihan is therefore highly likely to succeed on its breach of contract claims.

### 3.    Houlihan Is Likely To Succeed On Its Breach Of Duty of Loyalty/Breach of Fiduciary Duty Claim.

In light of Jay's blatant misappropriation of Houlihan's confidential and proprietary information during her employment and other disloyal conduct, Houlihan is also highly likely to succeed on its breach of duty of loyalty/breach of fiduciary duty claim.

9

It is well established under New York law that employees are fiduciaries and "owe their undivided and unqualified loyalty to" their employer. Howard v. Carr, 222 A.D.2d 843, 845, 635 N.Y.S. 326, 328 (3d Dep't 1995). An employee is therefore "'prohibited from acting in any manner inconsistent with [her] agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of [her] duties.'" DoubleClick v. Henderson, No. 116914/97, 1997 WL 731413, at *4-5 (Sup. Ct. N.Y. County Nov. 7, 1977) (quoting Lamdin v. Broadway Surface Adver. Corp., 272 N.Y. 133, 138 (1936)); accord Herrera v. Clipper Group, L.P., No. 97 Civ. 560 (SAS) 97 Civ. 561 (SAS) 1998 WL 229499, *2 n.2 (S.D.N.Y. May 6, 1998) (Scheindlin, J.). Inherent within the employee's fiduciary duty and duty of loyalty to the employer is the affirmative obligation "at all times to act in [the] employer's best interests." Maritime Fish Prods., Inc. v. World-Wide Fish Prods., Inc., 100 A.D.2d 81, 89, 474 N.Y.S.2d 281, 286 (1st Dep't) (employee liable for diversion of employer's business opportunities), appeal dismissed, 63 N.Y.2d 675 (1984).

Misappropriation of confidential information clearly constitutes a breach of an employee's fiduciary duty and duty of loyalty to the employer. Am. Fed. Group v. Rothenberg, 136 F.3d 897, 906 (2d Cir. 1998); Abraham Zion Corp. v. Lebow, 593 F. Supp. 551, 569-70 (S.D.N.Y. 1984) (Motley, J.), aff'd, 761 F.2d 93 (2d Cir. 1985). Moreover, the wrongful taking or copying by an employee of confidential documents is an egregious breach of fiduciary duty, whether or not the information taken or copied rises to the level of trade secret protection. Leon M. Reimer & Co., P.C. v. Cipolla, 929 F. Supp. 154, 161 (S.D.N.Y. 1996) (Parker, J.).

In this case, Jay has blatantly breached her fiduciary duty and duty of loyalty to Houlihan. Between as early as April 9, 2007, and continuing through May 24, 2007, it is indisputable that Jay stole Houlihan's confidential and proprietary information (and provided at

10

least some of it to Duff & Phelps), solicited Houlihan clients and diverted business opportunities from Houlihan to herself and Duff & Phelps. Such conduct is, without question, contrary to Houlihan's best interests. Therefore, Houlihan is likely to succeed on the merits of its claim that Jay breached her fiduciary duty and duty of loyalty to Houlihan.

> 4.   **Houlihan Is Likely To Succeed On Its Misappropriation of Confidential and Proprietary Information Claim.**

In order to prove a case of misappropriation under New York law, a plaintiff must prove that: (i) it possessed a trade secret or confidential and proprietary information; and (ii) the defendant used that trade secret or confidential and proprietary information in breach of an agreement, a confidential relationship or duty, or discovered the information through improper means. Hudson Hotels Corp. v. Choice Hotels Int'l, 995 F.2d 1173, 1176 (2d Cir. 1993). "[A] trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.' " Softel, Inc. v. Dragon Med. & Scientific Commcn's, Inc., 118 F.3d 955, 968 (2d Cir. 1997) (quoting Restatement of Torts § 757 cmt. b (1939)). In determining whether information constitutes a trade secret, New York courts have considered the following factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. See Ivy Mar Co. v. C.R. Seasons, Ltd., 907 F. Supp. 547, 556 (E.D.N.Y. 1995) (Block, J.).

11

The Houlihan documents that Jay took clearly constitute confidential and proprietary information and amount to trade secrets as well. Generally speaking, the documents constitute manuals or studies prepared for Houlihan's internal use at great expense, or they constitute confidential client documents. Indeed, not only are Houlihan's confidentiality interests at issue here, its clients' interests are at risk as well. Few, if any, of the documents that Jay took would be known outside Houlihan except, in the case of client documents, by the client for whom the document was prepared. While Houlihan manuals and studies would be well known within the company (as one would expect), confidential client information is only shared within the company on a need to know basis.

Houlihan takes significant steps to protect the confidentiality of its proprietary information, requiring every employee to execute a Proprietary Information and Developments Agreement (just like the one signed by Jay). In addition, Houlihan executes on a client-by-client basis confidentiality agreements for the purpose of protecting its clients' confidential information – much of the information taken by Jay is protected by these sorts of agreements as well. Finally, Houlihan password protects its computer system.

The information taken by Jay would be extremely valuable to Houlihan's direct competitors. Engagement letters reveal the precise services provided to a particular client and the price charged for those services. Such information would permit a direct competitor like Jay's new employer to undercut Houlihans' prices (without Houlihan having the same advantage as to her new employer). Houlihan has produced its manuals and internal studies at great cost – providing these to a competitor would be the equivalent of providing a road map to Houlihan's processes and its internal studies to its competitors free of change. Much of the material taken by Jay constitutes extremely sensitive client information that could be very damaging to

Houlihan's clients from a competitive standpoint (and ultimately, damaging to Houlihan, as the materials were disseminated by a Houlihan employee).

As set forth above, Jay took these documents in violation of an express contractual provision and contrary to her common law fiduciary duty and duty of loyalty to Houlihan, thereby satisfying the second element of a misappropriation claim.

### 5. Houlihan Is Likely To Succeed On Its Conversion Claim.

Conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." Vigilant Ins. Co. of Am. v. Hous. Auth. of El Paso, Texas, 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 347 (1995). To state a conversion claim, a plaintiff must allege "(1) title to the property converted, or his right to possession of that property; (2) an act of conversion by the defendant; and (3) damages caused by the conversion." Brass v. Am. Film Techs., Inc., 780 F. Supp. 1001, 1003 (S.D.N.Y.1991) (Freeh, J.). Houlihan indisputably owned the computer and the information stored on it. In anticipation of her departure, Jay sent to her personal e-mail account a substantial number of e-mails containing this information. In the absence of intervention by the Court, Jay will inevitably use this information to compete unfairly, resulting in damages to Houlihan. Houlihan is therefore likely to succeed on its claim of conversion against Jay.

### 6. Houlihan Is Likely To Succeed On Its Misappropriation of Corporate Opportunity Claim.

Under the doctrine of corporate opportunity, "corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation." Alexander & Alexander, Inc. v. Fritzen, 147 A.D.2d 241, 246, 542 N.Y.S.2d 530, 533 (1st Dep't 1989) (citations omitted). The first test asks whether the corporation had an interest or "tangible expectancy" in the opportunity. Burg v. Horn, 380 F.2d

13

897, 899 (2d Cir. 1967) (citations omitted).  Tangible expectancy has been defined as "something much less tenable than ownership, but, on the other hand more certain than a desire or a hope." Alexander, 147 A.D.2d at 247-48, 542 N.Y.S.2d at 534 (internal quotations and citation omitted).  As set forth above in connection with Jay's breach of contract, by directing a referral source on May 24, 2007 to contact her on her personal cell phone number (instead of at work), she diverted a corporate opportunity from Houlihan to herself.

**B.      Absent Injunctive Relief, Houlihan Will Be Irreparably Harmed.**

Based on the investigation it has been able to conduct thus far (without, of course, the benefit of any discovery), it has become clear that Jay will cause further irreparable harm to Houlihan if the Court does not intervene. Jay solicited at least seven Houlihan clients before leaving Houlihan's employment, stole substantial quantities of Houlihan's confidential and proprietary information and then destroyed electronically stored information – after being caught red-handed and confronted about her theft – apparently to cover up her misdeeds. See, e.g., Estee Lauder Cos. V. Batra, 430 F. Supp. 2d 158, 176-77 (S.D.N.Y. 2006) (Sweet, J.) (finding irreparable harm particularly because defendant demonstrated that his assurances of good faith lacked credibility); PepsiCo, Inc. v. Redmond, 54 F.3d 1269, 1270 (7th Cir. 1995) (finding irreparable harm especially in light of defendant's pattern of lies and lack of forthrightness in dealings with former employer).

New York courts presume irreparable harm when there exists even a *risk* that confidential information or trade secrets will be disclosed or misappropriated.  Lumex, Inc. v. Highsmith, 919 F. Supp. 624, 628 (E.D.N.Y. 1996) (Spatt, J.) (plaintiff established that former employee had learned its trade secrets and confidential information and "there is the potential of disclosure to the new employer"; irreparable harm standard therefore met); See also PepsiCo, 54 F.3d at 1269-70 (irreparable harm established based on inevitability that executive would disclose trade

14

secrets). Here, as the "risk" of misappropriation has already become a reality (and has been accompanied by other instances of Jay's perfidy), the Court must intervene to stem the tide of irreparable harm that is already being suffered by Houlihan. See Inflight Newspapers, Inc. v Magazines In-Flight LLC, 990 F. Supp. 119, 124 (E.D.N.Y. 1997) (Seybert, J.) (citing FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984) for the proposition that "the law is clear in the Second Circuit that irreparable harm is presumed where a trade secret has been misappropriated."); Estee Lauder, 430 F. Supp. 2d 158 at 174.

Further, courts have held that, where "it is inevitable that [defendant employee] will disclose important [plaintiff] trade secrets and confidential information," it is appropriate to issue an injunction to prevent any future disclosure. Lumex, 919 F. Supp. at 631. Here, it is inevitable that, in the absence of any prohibition to the contrary, Jay will unlawfully use Houlihan's confidential information in pursuit of the list of Houlihan clients she provided to Duff & Phelps, the Houlihan clients she solicited before quitting Houlihan and those about whom she converted confidential information. Jay will not be able to simply forget the confidential information she has taken from Houlihan as she pursues these clients. As the Seventh Circuit has recognized, "unless [defendant] possesse[s] an uncanny ability to compartmentalize information, he would necessarily be making decisions . . . by relying on his knowledge of [plaintiff's] trade secrets." PepsiCo, 54 F.3d at 1269.

The harm Houlihan would suffer from this inevitable disclosure cannot be quantified (and whatever measure is later affixed will be grossly inadequate to repair the irreparable damage that Houlihan will sustain). See FMC Corp., 730 F.2d at 63 (a trade secret, once lost, is lost forever and cannot be measured by money damages); Computer Assoc. Int'l, Inc. v. Bryan, 784 F. Supp. 982, 986 (E.D.N.Y. 1992) (Spatt, J.) (loss of trade secret causes irreparable harm which is not

measurable by money damages). The only remedy that will permit Houlihan to compete fairly and effectively is a temporary restraining order and preliminary injunction preventing Jay from interacting with the Houlihan clients that she improperly solicited, revealed to Duff & Phelps, or about which she converted confidential and proprietary information.

### C.    The Balance of Hardships Tips Decidedly in Plaintiff's Favor.

The irreparable competitive harm to Houlihan in the absence of its requested relief is detailed above. In stark contrast, Jay will not suffer any harm whatsoever. She is merely being returned in some measure to the position she occupied before engaging in various tortious and other inappropriate conduct towards Houlihan. In significant part, Houlihan seeks only to have Jay return and account for information that she should have never had in the first place. To the extent Jay suffers harm, it is thus "self-inflicted" by virtue of her decision to flout her duties to her employer, to breach her contractual obligations and to engage in tortious conduct against Houlihan. Merrill Lynch v. Napolitano, 85 F. Supp. 2d 491, 498 (E.D. Pa. 2000) ("The self-inflicted nature of any harm suffered by the wrongdoer [the employee] weighs heavily in favor of granting preliminary injunctive relief."); Merrill Lynch v. Ran, 67 F. Supp. 2d 764, 780 (E.D. Mich. 1999) (harm to former employees was "the least deserving of the court's consideration as their travails were needlessly self-imposed . . . .").

Beyond that, Houlihan does not seek to bar Jay from her profession or even from performing services for Duff & Phelps in any broad sense; it only seeks a prohibition as to Jay's solicitation of specific Houlihan clients and specific Houlihan employees. As most of those clients were developed by others at Houlihan and referred to Jay or by Jay while being compensated by Houlihan, she would only be deprived of working for those clients developed at Houlihan's expense. At a minimum, Houlihan should be given this relief at least until it has completed some discovery as to what Jay has done with the confidential information she took

16

from Houlihan. Without this relief, the irreparable harm will be greatly compounded by the time the Court holds a preliminary injunction hearing.

## POINT II.

### HOULIHAN MUST CONDUCT EXPEDITED DISCOVERY TO AVOID FURTHER AND PROLONGED IRREPARABLE INJURY

District courts have broad power to permit expedited discovery in appropriate cases. See Fed. R. Civ. P. 30(b) and 34(b). Expedited discovery may be granted when a plaintiff demonstrates: (1) irreparable injury; (2) some likelihood of success on the merits of its claims; (3) some connection between expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendants will suffer if expedited relief is granted. See Twentieth Century Fox Film Corp. v. Mow Trading Corp., 749 F. Supp. 473, 475 (S.D.N.Y. 1990) (Kram, J.); Advanced Portfolio Tech., Inc. v. Advanced Portfolio Tech Ltd., No. 94 Civ, 5620 1994 WL 719696, at *3 (S.D.N.Y. Dec. 28, 1994). These showings have all been made here.

The Court should permit expedited discovery especially in light of the particular urgency in this case. The prayer for injunctive relief and damages in the complaint does not alone provide a sufficient basis to protect Houlihan from further irreparable injury, particularly because Jay has already intentionally destroyed important evidence on her personal computer. Houlihan has founded its allegations concerning Jay's unlawful conduct solely on reliable information and belief, and limited personal knowledge. Resolution of the present application would be aided by a clear picture of Jay's present employment activities, as well as her activities before and since leaving Houlihan. Houlihan has no reliable means of ascertaining the necessary information without the Court's assistance. Unless expedited discovery is ordered, the irreparable injury that

17

Houlihan is now suffering as a result of Jay's unlawfulness will be unnecessarily prolonged. <u>See</u> <u>Advanced Portgolio Tech., Inc.</u>, 1994 WL 719696, at *3.

Houlihan seeks narrowly circumscribed categories of documents from Jay. From Jay, Houlihan would seek a supervised inspection of any personal computer equipment or mass storage devices in her possession, any documents reflecting communications with Houlihan clients and documents that she provided to Duff & Phelps in connection with her hire. By subpoena directed to Duff & Phelps, Houlihan would demand documents relating to the hire of Jay and other Houlihan employees, any information regarding Houlihan clients provided to Duff & Phelps by Jay, and any communications by Duff & Phelps with the specific Houlihan clients that are the subject of this application. As for depositions, Houlihan would request the deposition of Jay, and brief depositions of the Duff & Phelps individuals who were involved in hiring her or who used any Houlihan information she provided to them. In addition, Houlihan would seek the deposition of Eugene Urcan, a Duff & Phelps employee hired away from Houlihan's FAS group two weeks before Jay. We are unaware of any reason that Jay or Duff & Phelps cannot comply with these requests within a few days, and without undue burden. Accordingly, expedited discovery should be granted.

` CONCLUSION

For all these reasons, and those set forth in the papers accompanying this

memorandum, Plaintiffs respectfully request that the Court enter a temporary restraining order

against Jay, permit expedited discovery, and thereafter enter a preliminary injunction against Jay.

Dated: June 5, 2007

PROSKAUER ROSE LLP
*Attorneys for Plaintiff*
*Houlihan Lokey, Howard & Zukin, Inc.*

By:_____
        Steven M. Kayman
        Lloyd B. Chinn
        Brian S. Rauch
1585 Broadway
New York, NY  10036
Tel.: 212.969.3000
Fax: 212.969.2900

19

Appendix

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 719696 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)
▷

Advanced Portfolio Technologies, Inc. v. Advanced
Portfolio Technologies Ltd.
S.D.N.Y.,1994.
Only the Westlaw citation is currently available.
    United States District Court, S.D. New York.
    ADVANCED PORTFOLIO TECHNOLOGIES,
                INC., Plaintiff,
                       v.
    ADVANCED PORTFOLIO TECHNOLOGIES
LIMITED and Peter J. Ainsworth, Defendants.
            No. 94 CIV. 5620 (JFK).

                  Dec. 28, 1994.

        MEMORANDUM OPINION AND ORDER
KEENAN, District Judge:
*1 Plaintiff Advanced Portfolio Technologies, Inc.
("APT/NY") seeks leave to file a second amended
complaint in this action and to conduct expedited
discovery in advance of a motion for a preliminary
injunction.    Plaintiff also seeks leave to dismiss
defendant Peter J. Ainsworth as a defendant without
prejudice.    Advanced Portfolio Technologies
Limited    ("APT/UK")    opposes    plaintiff's
applications for leave to file a second amended
complaint and for expedited discovery.

                  BACKGROUND

APT/NY and APT/UK entered into a license
agreement in October 1990, whereby APT/UK
became the exclusive licensee for the APT system in
Europe (excluding France), South Africa, and the
Mideast.    The APT system is a computerized stock
portfolio risk management system.    APT/NY is
suing APT/UK for APT/UK's alleged failure to pay
royalties due to APT/NY under the license
agreement.

                  DISCUSSION

As an initial matter, this Court grants the motion to
dismiss Peter J. Ainsworth as a defendant without
prejudice.

I. The Proposed Second Amended Complaint

The proposed second amended complaint does not
seek to name any new defendants.    Rather, it seeks
to add additional causes of action for injunctive

relief.    The injunctive relief desired would seek to
prevent APT/UK from transferring assets and to
prevent APT/UK from "purloining" APT/NY's
secret information for competitive uses.

APT/UK opposes the filing of the second amended
complaint.    APT/UK states that the Court should
deny plaintiff leave to file the second amended
complaint because the additional relief it seeks-the
injunctions-would be futile because injunctive relief
obtained in the United States is not enforceable in
the United Kingdom.

        A. Standard for a Motion to Amend

Fed.R.Civ.P.    15 governs the amendment of
pleadings.    Under Rule 15(a), leave to amend a
pleading shall be freely granted when justice so
requires, one purpose being to provide maximum
opportunity for each claim to be decided on its
merits rather than on procedural technicalities.    See
Federal Practice and Procedure:    Civil § 1471.
The Second Circuit, in construing Rule 15(a)'s test
of "when justice so requires," has commented that
reasons for a proper denial of leave to amend
include undue delay, bad faith, futility of the
amendment, and the resulting prejudice to the other
side. Richardson Greenshields Sec. Inc. v. Lau, 825
F.2d 647, 653 n. 6 (2d Cir.1987) (citing State
Teachers Retirement Bd. v. Fluor Corp., 654 F.2d
843, 856 (2d Cir.1981) (quoting Foman v. Davis,
371 U.S. 178, 182 (1962))).    The Second Circuit
has more recently noted that neither delay, nor the
necessity of further discovery, nor the expenditure
of additional time and resources in litigating the
matters raised by the amendment, standing alone
without a showing of bad faith or undue prejudice,
will justify denial of leave to amend. See Block v.
First Blood Assocs., 988 F.2d 344, 350 (2d
Cir.1993) (citing State Teachers Retirement Bd. v.
Fluor Corp., 654 F.2d 843, 856 (2d Cir.1981)).

*2 Defendant claims that the amendments would be
futile. Leave to amend should not be granted where
the complaint as amended would not survive a
motion to dismiss.    See Benfield v. Mocatta Metals
Corp., No. 91 Civ. 8255 (LTF), 1992 WL 177154,
at *1 (S.D.N.Y.); Deem v. Lockheed Corp. 749
F.Supp. 1230, 1235 (S.D.N.Y.1989).    In deciding
whether Plaintiff has a colorable ground for relief,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                    Page   2
(Cite as: Not Reported in F.Supp.)

an inquiry similar to a Fed.R.Civ.P. 12(b)(6) should be made. *See Ragin v. Harry MackLowe Real Estate Co.*, 126 F.R.D. 475, 478 (S.D.N.Y.1989); *see also Northwestern Nat'l Ins. Co. v. Alberts*, 717 F.Supp. 148, 153 (S.D.N.Y.1989). Accordingly, the Court must accept the allegations set forth in plaintiff's second amended complaint as true and construe them in the light most favorable to plaintiff. *See Frazier v. Coughlin*, 850 F.2d 129, 129 (2d Cir.1988); *Arbitron Co. v. Tropicana Prod. Sales, Inc.*, No. 91 Civ. 3697 (PKL), 1993 WL 138965, at *3 (S.D.N.Y.) (citing *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir.1992), *cert. denied*, 113 S.Ct. 1387 (March 1, 1993)). Thus, the Court may only deny leave if it appears beyond doubt that plaintiff cannot prove any facts in support of its claim.    Further, a trial court has discretion to grant a party leave to amend a complaint even where the amended pleading might ultimately be dismissed. *See Morse/Diesel, Inc.*, 715 F.Supp. at 581 (citing *S.S. Silberblatt Inc. v. East Harlem Pilot Block Bldg., 1 Housing Dev. Fund Co.*, 608 F.2d 28, 42-43 (2d Cir.1979)).

### B. Analysis

The Court grants APT/NY's application for leave to file a second amended complaint.  Keeping in mind that leave to amend is freely granted, the Court finds that the question of ultimate enforceability of the injunctive relief does not preclude this Court from exercising its discretion to grant the application to amend.    Defendant APT/UK does not specifically comment on the viability of the second amended complaint other than to argue that the injunctions, if issued, will not be enforceable in the United Kingdom.    The Court notes that, in the license agreement, the parties explicitly submitted to this Court's jurisdiction.  Accepting the facts alleged in the second amended complaint as true, the Court does not find that possible inability to enforce the injunctive relief is adequate reason to deny leave to amend.

### II. Expedited Discovery

APT/NY additionally seeks expedited discovery in advance of a motion for a preliminary injunction. At a pre-trial conference on November 21, 1994, this Court gave APT/NY advance permission to make that motion in the event that the Court gave permission to file the second amended complaint.

APT/NY claims it needs this expedited discovery for two reasons:  1) that APT/UK fraudulently converted the funds of APT/NY for its own use; and, 2) that APT/UK has used the confidential and proprietary information of APT/NY to develop a competing product.

*3 APT/NY seeks four expedited depositions. Specifically, plaintiffs seek to depose the following: APT/UK, by Peter J. Ainsworth; Timothy Wilding, an employee of either APT/UK or of Ainsworth's alleged new entity;  Hans Erikson, an employee of DAIS Corp.FN1;  and Robert Butman, CEO of DAIS Corp.  APT/UK opposes this application.

### A. Standard for Expedited Discovery

Expedited deposition discovery is made available by Rules 30(a) of the Federal Rules of Civil Procedure. Expedited discovery is often available in cases where preliminary relief is sought.    *See e.g., United States Naval Inst. v. Charter Communications*, 875 F.2d 1044, 1046 (2d Cir.1989);    *Tetra Sales (U.S.A.) v. T.F.H. Publication, Inc.*, 839 F.2d 881, 882 (2d Cir.1988); *Denny v. I.S. Lab., Inc.*, 737 F.Supp. 247, 248 (S.D.N.Y.1990).    In order to be entitled to expedited discovery,
... the plaintiff must demonstrate (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.

*Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y.1982).

### B. Analysis

APT/NY has established that it is entitled to the expedited deposition discovery that it seeks.    The two primary reasons APT/NY gives for needing expedited discovery to support a preliminary injunction are that APT/UK fraudulently converted the funds of APT/NY for its own use (apparently the basis for the deposition of APT/UK by Ainsworth and the deposition of Wilding) and that APT/UK has used the confidential and proprietary information of APT/NY to develop a competing product (apparently an additional basis for the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                       Page  3
(Cite as: Not Reported in F.Supp.)

depositions of Ainsworth and Wilding and also the
basis for the depositions of Erikson and Butman).

As an initial matter, the Court does not find that
APT/NY has established that APT/UK has
purloined any assets or funds belonging to APT/
NY.   APT/NY states that APT/UK, through
Ainsworth, authorized Ainsworth and his wife to
each receive a salary of 30,000 pounds a month.
APT/NY bases this contention on the previously
suppressed recollection of a conversation that Jamie
Ridyard, a former employee of APT/UK and current
employee of APT/NY, allegedly overheard.   This
has been conclusively rebutted-Ainsworth and his
wife were each receiving 30,000 pounds per year.
APT/NY also makes a statement that "Ainsworth
gave Ridyard the distinct impression that he
[Ainsworth] had already taken royalty money out of
APT/UK."   The Court does not find that a "distinct
impression" of an ex-employee whose recollection
has already proved faulty at least once is adequate
support for the expedited deposition discovery of
Ainsworth and Wilding sought here.   Therefore,
APT/NY's  contention  that  APT/UK  through
Ainsworth is fraudulently converting funds does not
support the requested expedited discovery.

*4 On the other hand, APT/NY's contention that
APT/UK has misused confidential or proprietary
information does sufficiently support the requested
expedited discovery.   Ainsworth admits that he is
pursuing the possibility of licensing DAIS Corp.'s
"Worldtrack," a competitor of the APT system.
APT/NY contends that DAIS Corp.'s system was
developed using its confidential and proprietary
information.        While nothing in the license
agreement prevents Ainsworth from competing with
APT/NY, and licensing the product of a competitor
does not prove a misuse of confidential or
proprietary information belonging to APT/NY,
APT/NY has produced evidence that the DAIS
Corp. system is of very recent vintage and was
developed remarkably rapidly for such a complex
system.       The Court finds that APT/NY has
sufficiently supported its need for the expedited
depositions of DAIS Corp. employees Erikson and
Butman as well as those of Ainsworth and Wilding.

*CONCLUSION*

The application to file a second amended complaint
is granted.   The application to take four expedited

depositions in advance of a motion for a preliminary
injunction is granted.

SO ORDERED.

FN1. DAIS Corp. is a sublicensee of the APT
system.    DAIS Corp. has recently developed its
own stock portfolio management system known as
"Worldtrack" that apparently will compete with the
APT system.   Ainsworth is now discussing doing
business with DAIS Corp.
S.D.N.Y.,1994.
Advanced Portfolio Technologies, Inc. v. Advanced
Portfolio Technologies Ltd.
Not Reported in F.Supp., 1994 WL 719696
(S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page   1
Not Reported in F.Supp.2d, 2006 WL 516767 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

**H**

Bro-Tech Corp. v. Thermax, Inc.
E.D.Pa.,2006.
Only the Westlaw citation is currently available.
    United States District Court,E.D. Pennsylvania.
    BRO-TECH CORPORATION t/a the Purolite
            Company, et al., Plaintiffs
                         v.
    THERMAX, INC. d/b/a Thermax USA Ltd., et al.,
                    Defendants
                 No. Civ.A.05-2330.

                   Feb. 28, 2006.

Joseph J. Centeno, Joseph J. McGovern, Obermayer
Redmann Maxwell & Hippel LLP, Philadelphia,
PA, Stephen J. Cabot, Plymouth Meeting, PA,
Mathieu Shapiro, Obermayer, Rebmann, Maxwell &
Hippel, LLP, Philadelphia, PA, for Plaintiffs.
Daniel S. Bernheim, Jonathan A. Cass, Silverman
Bernheim & Vogel, Philadelphia, PA, Grant
Hanessian, Jacob Max Kaplan, Baker & McKenzie
LLP, New York, NY, for Defendants.

                   *ORDER*

RUFE, J.
*1 AND NOW, this 28th day of February 2006,
upon consideration Defendants' Motions to Dismiss
[Docs. # 26 and # 30], Plaintiffs' Responses thereto
[Docs. # 32 and # 38], Defendants' Reply [Doc. #
56], Plaintiffs' Supplemental Response [Doc. # 71],
and Defendants' Supplemental Response [Doc. #
84], it is hereby ORDERED that the Motions to
Dismiss are DENIED WITHOUT PREJUDICE.
FN1

FN1. On May 18, 2005, Plaintiffs filed this lawsuit
alleging numerous claims arising from the theft of
its trade secrets by Plaintiffs' former employees and
their new employer, a rival corporation. Plaintiffs'
original Complaint included only one claim under
federal law, namely the Computer Fraud Abuse Act
("CFAA"), 18 U.S.C. § 1030 (2000). In a
teleconference held the day after the original
Complaint was filed, Defendants suggested the
CFAA claim was without substance and plead solely
to invoke federal jurisdiction, since diversity of
citizenship was lacking. The Court directed
Defendants to brief the issue formally and allowed
Plaintiffs to undertake limited discovery to establish
subject matter jurisdiction under the CFAA.

On August 1, 2005, Plaintiffs filed an Amended
Complaint adding another federal claim, under the
Racketeer Influenced and Corrupt Organizations Act
("RICO"), 18 U.S.C. §§ 1961-68 (2000). Pursuant
to the Court's earlier direction, Defendants filed the
instant motions to dismiss the Amended Complaint.

            A. CFAA

In Count VII of the Amended Complaint, Plaintiffs
plead claims under two provisions of the CFAA.
First, Plaintiffs allege that Sachdev, Gleasman, and
Gresham violated section 1030(a)(4), punishing
"whoever ... knowingly and with intent to defraud,
accesses a protected computer without authorization,
or exceeds authorized access, and by means of such
conduct furthers the intended fraud and obtains
anything of value." Second, Plaintiffs allege that
Sachdev, Gleasman, and Gresham violated sections
1030(a)(5)(A)(iii) and 1030(a)(5)(B)(i), punishing
"whoever ... intentionally accesses a protected
computer without authorization, and as a result of
such conduct, causes damage" and "loss to 1 or
more persons during any 1-year period ...
aggregating at least $5,000 in value."

Defendants argue that Count VII should be
dismissed for lack of subject matter jurisdiction and/
or failure to state a claim under the CFAA. The
thrust of Defendants' argument is that the kind of
activity alleged here-employees taking confidential
and proprietary information from their former
employer's computers for delivery to their new
employers-does not violate the CFAA. While courts
are in disagreement on this issue, this Court is
persuaded by the view represented in *Shurgard
Storage Centers, Inc. v. Safeguard Self Storage,
Inc.,* 119 F.Supp.2d 1121, 1129, holding that "the
CFAA was intended to encompass actions such as
those allegedly undertaken" here. *See also P.C.
Yonkers, Inc. v. Celebrations the Party and
Seasonal Superstore, LLC,* 428 F.3d 504, 510 (3d
Cir.2005) (recognizing, in dicta, the increasingly
expansive scope of the CFAA); *but see Int'l Ass'n of
Machinists and Aerospace Workers v. Werner-
Masuda,* 390 F.Supp.2d 479, 499 (D.Md.2005)
(holding that the CFAA does not recognize a cause
of action in the circumstances alleged here).

Furthermore, to the extent Plaintiffs state a claim

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

under the CFAA, they have also put forward enough evidence to establish that their CFAA claim is not "wholly insubstantial and frivolous" for purposes of subject matter jurisdiction. *See Gould Electronics, Inc. v. United States,* 220 F.3d 169, 178 (3d Cir.2000) ("A claim may be dismissed udner Rule 12(b)(1) only if it 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction' or is 'wholly insubstantial and frivolous" '). Therefore, the Court will exercise federal jurisdiction over Plaintiffs' CFAA claims.

## B. RICO

In Counts XI and XII of the Amended Complaint, Plaintiffs plead that the former Purolite employees and the Thermax executives violated sections 1962(c) and (d) of RICO by conspiring to steal-as well as actually stealing-Purolite's trade secrets. Section 1962(c) of RICO criminalizes conduct by a "person employed by or associated with any enterprise" engaged in a pattern of racketeering, and section 1962(d) criminalizes conspiracy to violate subsection (c).

**\*2** Defendants argue that both RICO counts should be dismissed for lack of subject matter jurisdiction and/or failure to state a claim. Their argument is two-fold: (1) Plaintiffs do not allege wrongdoing by a "person" who owns or operates the RICO "enterprise," i.e. Thermax; and (2) Plaintiffs do not allege a pattern of racketeering. The first assertion is unpersuasive because "RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise." *Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993); *see also United States v. Parise,* 159 F.3d 790, 796 (3d Cir.1998) (explaining that *Reves* "made clear that RICO liability may extend to those who do not hold a managerial position within an enterprise"). The second assertion is also unpersuasive. As a matter of law, "[u]se of the mails and/or wires in connection with the misappropriation of confidential propriety information has been held to constitute mail and/or wire fraud." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* Civ. A. No. 95-1698, 1995 WL 455969, at \*8 (E.D.Pa. July 27, 1995) (citing *Carpenter v. United States,* 484 U.S. 19, 27, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987)). Furthermore,

for purposes of the instant motions, Plaintiffs have alleged and demonstrated a scheme sufficient to constitute a "pattern of racketeering" under RICO. Therefore, the Court will exercise federal jurisdiction over Plaintiffs' RICO claims.

## C. Personal Jurisdiction

Another court in this district has outlined the standard of review for a motion to dismiss for lack of personal jurisdiction as follows:

The Court enjoys "considerable procedural leeway" in deciding a motion to dismiss for lack of personal jurisdiction: "[t]t may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." If the court decides *not* to conduct an evidentiary hearing, the plaintiff "need make only a *prima facie* showing of jurisdiction through its affidavits and supporting materials." Plaintiff must eventually establish jurisdiction by a preponderance of the evidence, "either at a pretrial hearing or at trial. But until such a hearing is held, a *prima facie* showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion ."

*Leonard A. Feinberg, Inc. v. Cent. Asia Capital Corp.,* 936 F.Supp. 250, 253-54 (E.D.Pa.1996) (internal citations omitted). In determining whether plaintiff has made a *prima facie* case, "the Court does not act as a fact-finder" but rather " 'accepts properly supported proffers of evidence by the plaintiff as true.' " *Id.* at 254.

Applying that standard here, the Court finds that Plaintiffs have presented sufficient proffers of evidence to establish a *prima facie* case of personal jurisdiction over all Defendants. With respect to the Thermax India executives, Plaintiffs' *prima facie* case rests on the executives' participation in the conspiracy to steal Purolite's trade secrets. The deposition testimony of Sachdev, the employment agreement between Sachdev and Thermax, and e-mail correspondence between Sachdev and the Thermax India executives-when credited in Plaintiffs' favor for purposes of the instant motions-suggest that the Thermax India executives were aware or should have been aware of substantial acts in furtherance of that conspiracy. *See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 846

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page   3
(Cite as: Not Reported in F.Supp.2d)

F.Supp. 374, 379 (E.D.Pa.1994); *Murray v. Nat'l
Football League*, No. Civ. A. 94-5971, 1996 WL
363911, at *15 (E.D.Pa. June 28, 1996) ("Plaintiff
must show substantial acts in furtherance of the
conspiracy within the forum, of which the out-of-
state conspirator was or should have been aware.").

*3 Although Plaintiffs have satisfied their initial
burden, they eventually must establish personal
jurisdiction by a preponderance of the evidence at a
later stage of the proceedings. Therefore, the Court
will permit additional time for discovery on this
issue and will allow the Defendants to re-raise any
objections to personal jurisdiction upon the close of
that discovery.

E.D.Pa.,2006.
Bro-Tech Corp. v. Thermax, Inc.
Not Reported in F.Supp.2d, 2006 WL 516767
(E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in N.Y.S.2d
Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
(Cite as: Not Reported in N.Y.S.2d)
▷

Page  1

Doubleclick, Inc. v. Henderson
N.Y.Co.Ct.,1997
Only the Westlaw citation is currently available.
NOT APPROVED BY REPORTER OF
DECISIONS FOR REPORTING IN STATE
REPORTS. NOT REPORTED IN N.Y.S.2d.
Supreme Court, New York County, New York.
DOUBLECLICK, INC.,
v.
David HENDERSON, Jr., Jeffrey A. Dickey, and
Alliance Interactive Networks, Defendants.
No. 116914/97.

Nov. 7, 1997.

Orrick, Herrington & Sutcliffe, LLP (Michael
Carlinsky, Anthony Carabba, Jr., Rene Kathawala,
of counsel), New York City, for plaintiff.
Pollack & Greene LLP (Kennard M. Goodman,
Michael E. Green, of counsel), New York City, for
defendant.
DeGRASSE, J.:
*1 In this action alleging, *inter alia*,
misappropriation of trade secrets, unfair
competition, and breach of employees' duty of
loyalty, plaintiff DoubleClick, Inc. ("DoubleClick")
moves for a preliminary injunction to bar its former
employees, defendants David Henderson, Jr.
("Henderson") and Jeffrey A. Dickey ("Dickey")
from engaging in business activities in competition
with DoubleClick.

FACTS

A. *The Parties*

DoubleClick is engaged in the relatively new and
fast-growing business of selling advertising on the
Internet.    Headquartered in New York City,
DoubleClick was formed in 1996 from the merger of
two entities engaged in Internet advertising, a
division, known as DoubleClick, of the advertising
agency Bozell, Jacobs, Kenyon & Eckhardt, Inc.
("Bozell"), and a company known as the Internet
Advertising Network.

DoubleClick has two sets of clients: web sites and
advertisers.    It has entered into agreements with a
network of approximately 75 popular web sites to
sell advertising space on the sites.    DoubleClick and

the web sites split the advertising revenue generated
by DoubleClick's efforts.

Advertisers also pay DoubleClick for access to its
network of web sites.    By negotiating a single
contract with DoubleClick an advertiser can have its
ad shown on all of the web sites in the DoubleClick
network without having to enter into negotiations
with each web site.    Advertisers may also choose to
focus their advertisements on certain web sites in the
DoubleClick network.

Advertisements at web sites frequently appear as
"banners" which a viewer may "click on" to learn
about a product.    A banner is a link to a web site
maintained by the company selling the product.
For example, when an individual visits a web site
devoted to fly fishing, perhaps to seek out
information on local fishing conditions, she would
likely pass through pages in the web site that
included banners for companies making rods, reels,
and other paraphernalia associated with the sport, as
well as banners for non-fishing products, such as
sport utility vehicles, aimed at a larger group of
which fly fishers are a subset.    If this person so
chose, she could then click on the banner for a given
company to learn more about its products.

Among the services that DoubleClick has developed
are a proprietary advertisement delivery system that
distributes advertisements to web sites in its network
in a matter of milliseconds, a system that causes
certain ads to appear when a user uses certain search
terms, and a number of technologies designed to
gauge the effectiveness of the advertisements.
DoubleClick also claims a competitive advantage by
virtue of the quality of its network, which it claims
includes a number of the most-visited web sites.

DoubleClick claims to have generated significant
proprietary information concerning its sales and
marketing strategies, financial projections and
results, requirements of its advertisers, and the
success of its clients' ads.    It also generated a
business plan in 1996 that sets forth its long-term
goals and strategies ("DoubleClick 1996 Business
Plan").    This document was shown to venture
capital firms.    DoubleClick contends that these
various categories of information are all trade
secrets.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d
(Cite as: Not Reported in N.Y.S.2d)

**\*2** There is evidence in the record that the Internet advertising business is an extremely competitive one, with a variety of companies using different software and sales techniques to maximize the effectiveness of its clients' advertising.

Defendant Dickey was hired in October 1995 by Poppe, Tyson, a subsidiary of Bozell, to work for the original DoubleClick.   As Vice President of Business Development Dickey worked on a variety of matters for DoubleClick out of its California offices.   Dickey was sufficiently senior that he had access to most of the information that DoubleClick claims herein is confidential, including its 1996 Business Plan, its revenue projections, plans for future projects, pricing and product strategies, and its various databases with information concerning DoubleClick's clients.   When he was hired Dickey entered into an agreement with Bozell to maintain the confidentiality of information provided by its clients, and a covenant not to compete for Bozell's clients for one year after leaving Bozell.   The parties dispute whether either agreement is applicable to the events described in the complaint.

Defendant Henderson came to DoubleClick in March 1996, partly on Dickey's recommendation, as Vice President of North American Advertising Sales.   Based in DoubleClick's headquarters in New York City, he was responsible for hiring, training and managing DoubleClick's sales force. Henderson was a member of DoubleClick's management team and the company's highest paid employee.   Henderson had access to all the allegedly confidential company information that Dickey was privy to, and in addition was given highly confidential documents when he attended DoubleClick's management and Board of Directors meetings.   These documents were distributed to DoubleClick's top managers at the beginning of the meetings and then collected at the end.   They concerned, *inter alia,* summaries of operations, revenue and expense analyses, analytical summaries of financial indicators, and other highly confidential information.   Like Dickey, Henderson entered into a confidentiality agreement with Bozell upon his employment.   Henderson did not enter into a covenant not to compete.

B. *Henderson's and Dickey's Plans to Leave DoubleClick and Start Their Own Internet Advertising Business*

Henderson alleges in his affidavit that he gradually became dissatisfied with the way that DoubleClick was run, and that his dissatisfaction came to a head when he was offered a job in early 1997 by America Online ("AOL"), an on-line service.   Henderson took AOL's offer of employment to DoubleClick's CEO, Kevin O'Connor, who made a counter-offer which Henderson accepted.   Henderson alleges that DoubleClick failed to comply with the terms of their agreement.    By the "early summer" of 1997, Henderson "came to the conclusion that DoubleClick was not going to provide me with the long-term career opportunities I had expected when I joined the company the previous year." (Affidavit of David Henderson ["Henderson Aff."], sworn to October 3, 1997, ¶ 42.)

**\*3** In July 1997 Henderson and Dickey both attended an industry-wide trade conference in Colorado.   At the conference they discussed their dissatisfaction with DoubleClick's direction and resolved to start their own company, Alliance Interactive Network ("Alliance").    Upon their return to their respective offices, Dickey and Henderson began to take steps to make their company a reality, including drafting a business plan, seeking out investors and customers, and entering into discussions with at least one other DoubleClick employee.

According to his affidavit, Kevin Ryan, DoubleClick's President, received a tip on September 2, 1997 that Henderson and Dickey were planning on leaving DoubleClick to start their own Internet advertising company.   Ryan and O'Connor went to Henderson's office the next day and confronted him with this allegation, which Henderson did not deny.   Ryan and O'Connor fired Henderson on the spot and instructed him to remove his personal property from the office.

Ryan confiscated Henderson's laptop computer. Information retrieved from this laptop's hard drive, including saved e-mail messages, a draft of Alliance's business plan, and other strategic documents, provides much of the evidence offered in support of plaintiff's motion.FN1

FN1. DoubleClick personnel also confiscated Dickey's laptop.    Plaintiff contends that it was unable to access any files from this computer because Dickey "booby-trapped" it to delete files if

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



someone tried to access the files without the proper password.    Dickey contends that the laptop was simply a "lemon" that had crashed several times before, and that DoubleClick personnel could have easily forestalled the erasure of files caused by the machine's malfunction.

## DISCUSSION

In order to demonstrate that it is entitled to a preliminary injunction DoubleClick must show a probability of success on the merits, danger of irreparable injury in the absence of a preliminary injunction and a balance of the equities in its favor. (*Aetna Ins. Co. v. Capasso*, 75 N.Y.2d 860; CPLR 6312.)  The Legislature added a new subdivision (c) to CPLR 6312 effective January 1, 1997, to make clear that the existence of an issue of fact on a motion for a preliminary injunction is not, standing alone, a sufficient basis for denying a preliminary injunction.        This amendment was designed to overcome the language of several judicial opinions that held that a preliminary injunction must be denied whenever the party opposing the motion demonstrates that the facts are in "sharp dispute." ( *Cf. BR Ambulance Service, Inc. v. Nationwide Nassau Ambulance*, 150 A.D.2d 745.)

### A. Likelihood of Success on the Merits

DoubleClick has asserted numerous claims against the defendants.    In arguing that it is likely to succeed on the merits DoubleClick leads with its claims that defendants misappropriated trade secrets, engaged in unfair competition, and breached their duty of loyalty.   As discussed below, DoubleClick has demonstrated that it is likely to succeed on these three claims, and it is therefore unnecessary to consider plaintiff's remaining claims.

### 1. Misappropriation of Trade Secrets

The    elements    of    a    cause    of    action    for misappropriation of trade secrets are that 1) plaintiff possesses a trade secret and 2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.    (*See Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173.)

*4 The parties agree that the courts of this state have

adopted the definition of trade secret set forth in the Restatement of Torts:    "any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  (Restatement of Torts, § 757, comment b;  *see Ashland Management v. Janien*, 82 N.Y.2d 395, 407.)

The Restatement lists several factors to be considered in evaluating a claim of trade secrecy: (1) the extent to which the information is known outside of [the] business;  (2) the extent to which it is known by employees and others involved in [the] business;  (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors;  (5) the amount of effort or money expended by [the business] in developing the information;  (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

(Restatement of Torts § 757, comment b.)

As top executives at DoubleClick, Dickey and particularly Henderson had access to highly sensitive information regarding the company, including its revenue projections, plans for future projects, pricing and product strategies, and databases containing information collected by DoubleClick concerning its clients. defendants do not seriously dispute that they had access to this array of information, nor that the information could be of great use to any competitor of DoubleClick.

Defendants argue instead that the information that DoubleClick seeks to protect is not kept confidential by DoubleClick and is actually published on DoubleClick's own web site.        Therefore, defendants argue, the information cannot qualify as a trade secret.   This assertion is not borne out by the record.   The web site describes DoubleClick's business in generalities;  it does not contain the proprietary information generated by DoubleClick specified in plaintiff's papers as trade secrets.

For example, information concerning the quantity and quality of visits to advertisements posted on the various web sites that make up DoubleClick's network is not provided by DoubleClick's own web sites.   Nor is information concerning DoubleClick's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in N.Y.S.2d
(Cite as: Not Reported in N.Y.S.2d)

Page   4

actual financial arrangements with its clients provided. Defendants make much of the fact that DoubleClick's "rate card", i.e. prices charged to advertisers, is posted on the web site. However, DoubleClick states that pricing in the Internet advertising business is "deal driven" and tailored to the needs of individual clients. Defendants' own business plan for Alliance supports this assertion. (Affidavit of Wenda Harris Millard, sworn to October 14, 1997 at ¶¶ 27-30, Exh. A.)

There is substantial evidence in the record that defendants misappropriated DoubleClick's trade secret information in derogation of their duties as DoubleClick employees.FN2

FN2. As employees of DoubleClick defendants owed their employer a duty not to divulge confidential information, therefore it is not necessary to determine the viability of the confidentiality agreements and Dickey's covenant not to compete. "Even in the absence of a contract restriction, a former employee is not entitled to solicit customers by fraudulent means, the use of trade secrets, or confidential information." (*Support Systems Assocs., Inc. v. Tavolacci*, 135 A.D.2d 704, 706.)
If any event these agreements do not on their face unambiguously apply to the events at issue herein. The agreements were with DoubleClick's former corporate home, Bozell, and Bozell's subsidiaries. It is not clear that the parties intended DoubleClick to succeed in Bozell's interest once it became independent of Bozell. Indeed, DoubleClick admits that it had circulated new confidentiality agreements to its employees once it became independent of Bozell. Dickey and Henderson had not signed their new confidentiality agreements when they were fired. (Affidavit of Kevin Ryan, sworn to September 18, 1997, 26.) Additionally, the confidentiality agreements protect only information designated as confidential by Bozell's clients, not information generated by Bozell.

*5 Dickey and Henderson were privy to the actual rates charged DoubleClick's clients. A document copied from Henderson's computer, titled "Stakeholder Positioning Analysis," gives rise to a strong inference that Dickey and Henderson were prepared to use this confidential information to compete directly for DoubleClick's web site clients. This document refers to DoubleClick's "margin"

also known as "site share", which is the percentage shares that DoubleClick and a client web site split from advertising revenues. The Stakeholder Positioning Analysis indicates that defendants intended to advise Alta Vista, DoubleClick's largest client, that DoubleClick's percentage share of advertising revenues generated at the Alta Vista web site is too high. (*See* Affidavit of Kevin O'Connor, sworn to September 18, 1997 ("O'Connor Aff.") Exhibit 9.

In his affidavit, Henderson states that the Stakeholder Positioning Analysis was merely a strategic exercise, and that he and Dickey had decided not to pursue such an aggressive strategy in wooing DoubleClick's clients. However, Henderson states only "that I agreed to take the high road by not making disparaging remarks about DoubleClick." (Henderson Aff. ¶ 54.) Tellingly, he does not state in his affidavit that he will not use DoubleClick's margin information. At the least, the Stakeholder Positioning Analysis demonstrates that defendants have sensitive proprietary information regarding DoubleClick's pricing, and have at least contemplated using such information to compete against their former employer.

Additionally, the draft Alliance business plan found on Henderson's computer discloses the number of visits to various web sites in the DoubleClick Network and the current sales for each site. Plaintiff claims that this information is confidential, and defendants have brought fourth no evidence to refute this claim. Defendants do not assert that this information is published on DoubleClick's web site or made public in any way. It is undisputed that the draft Alliance business plan was e-mailed to a person whom plaintiff characterizes, without contradiction from defendants, as "an industry consultant with ties to DoubleClick's competitors." (O'Connor Aff. ¶ 18.)

DoubleClick's confidential information about its pricing and customers constitutes trade secrets. Based on evidence of actual misappropriation of this information, DoubleClick has adequately demonstrated likelihood of success on the merits on its misappropriation of trade secrets claim. (*E.g. Support Systems Assocs., Inc. v. Tavolacci*, 135 A.D.2d 704, 706; *Advanced Magnification Systems of Oneonta, N.Y. Ltd. v. Minuteman Optical Corp.*, 135 A.D.2d 889; *Webcraft Technologies, Inc. v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in N.Y.S.2d
(Cite as: Not Reported in N.Y.S.2d)

Page  5

*McCaw*, 674 F Supp 1039.) FN3

FN3. DoubleClick offers an e-mail message off of Henderson's computer in which Henderson states that he "cut and pasted" DoubleClick's 1996 Business Plan to create Alliance's draft business plan. (O'Connor Aff., Exh. 1.) The parties spend a good deal of time arguing whether DoubleClick's 1996 Business Plan should be considered a trade secret. The extent to which the DoubleClick Plan was distributed to its employees and potential investors, and hence whether the document was kept sufficiently confidential by DoubleClick to qualify as a trade secret, cannot be resolved on the record before the court. Moreover, even if the DoubleClick Plan *does* qualify as a trade secret the record is unclear as to whether the plan was actually misappropriated by defendants. Henderson states that he only used the "format" of the DoubleClick plan, implying that he did not crib its substance. (Henderson Aff. ¶ 55.)

This finding is bolstered by the fact that there is a high probability of "inevitable disclosure" of trade secrets in this case. Injunctive relief may issue where a former employee's new job function will inevitably lead her to rely on trade secrets belonging to a former employer. In *Lumex Inc. v. Highsmith* (919 F Supp 624 [EDNY 1996] ) the court granted an injunction preventing a management representative from working with a competitor of plaintiff. The court held that the former employee would likely disclose plaintiff's trade secrets "to aid his new employer and his own future.... [Defendant] was privy to the top secret Cybex product, business and financial information. He cannot eradicate these secrets from his mind." (*Id.* at 631; *PepsiCo Inc. v. Redmond*, 54 F.3d 1262, 1269.)

*6 In the instant case it appears to the court that the defendants will inevitably use DoubleClick's trade secrets. Like the executive in *Lumex*, the centrality of Henderson and Dickey in DoubleClick's operations makes it unlikely that they could "eradicate [DoubleClick's] secrets from [their] mind." (*Lumex supra*, 919 F Supp at 631.) Moreover, the actual use of DoubleClick's trade secrets described above, and other actions discussed below, demonstrate defendants' cavalier attitude toward their duties to their former employer. This gives rise to a reasonable inference that they would

use DoubleClick's confidential information against it.

For the above-stated reasons, DoubleClick has demonstrated that it is likely to succeed on its misappropriation of trade secrets claim.

1. Duty of Loyalty

It is well-established in the law of this state that an employee "is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." (*Lamdin v. Broadway Surface Adv. Corp.*, 272 N.Y. 133.) While an employee may secretly incorporate a competitive business prior to his departure, he must not "use his principal's time, facilities or proprietary secrets to build the competing business." (*Maritime Fish Products Inc. v. World Wide Fish Products, Inc.*, 100 A.D.2d 81, 88, *appeal dismissed* 63 N.Y.2d 675; *see 7th Sense, Inc. v. Liu*, 220 A.D.2d 215.)

While Henderson tries to minimize his use of DoubleClick's facilities and time by stating that he did much of his work for Alliance while on vacation in August, it is clear that he used the company computer and e-mail service to build Alliance. While the parties dispute which portions of the DoubleClick 1996 Business Plan were used in drafting Alliance's business plan, defendants do not deny that they used this DoubleClick document, even if it was only for formatting purposes, to further their own plans to launch Alliance. There is also evidence that defendants used DoubleClick's spread sheets to draft projected spreadsheets for Alliance. Additionally, Henderson does not deny that he engaged in some Alliance-related activities during company time.

Henderson admits that he and Dickey met with a potential client on behalf of DoubleClick and after making a presentation on behalf of DoubleClick then made a presentation regarding Alliance. (Henderson Aff. ¶ 58.) The solicitation of an employee's planned competitive business constitutes a breach of the duty of loyalty. (*E.g. Maritime Fish*, 100 A.D.2d at 89-90.)

Additionally, plaintiff has offered e-mail dated September 2, 1997, from Henderson's computer that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in N.Y.S.2d
(Cite as: Not Reported in N.Y.S.2d)

Page  6

demonstrates that Henderson solicited financing for Alliance from Match Logic, one of DoubleClick's competitors, in exchange for 2000 hours of "consulting time" from Alliance. While the precise content of this proposed "consulting" is not clear from the record, it is problematic that Henderson and Dickey would begin advising a DoubleClick competitor so soon after leaving DoubleClick given defendants' access to, and use of, DoubleClick's trade secrets. The e-mail indicates that Match Logic was sufficiently worried about defendants' activities to require that they indemnify Match Logic as part of the deal. (O'Connor Aff. Exh. 5.)

*7 These facts demonstrate that plaintiff is likely to succeed on the merits of its claim sounding in breach of the duty of loyalty.

### 3. Unfair Competition

A claim of unfair competition will lie where a former employee misappropriates and exploits confidential information belonging to her former employer in abuse of her relationship of trust. (E.g. *Comprehensive Community Development Corp. v. Lehach*, 223 A.D.2d 399; *Advanced Magnification Instruments, supra*, 135 A.D.2d 889.) The facts recited above that tend to show that Dickey and Henderson engaged in misappropriation of trade secrets and breached their duty of loyalty to DoubleClick also show that plaintiff is likely to succeed on the merits of this claim as well.

### B. *Irreparable Harm*

Irreparable harm is presumed, where, as here, trade secrets have been misappropriated. (*Lumex, supra*, 919 F Supp at 628.) Defendants have offered nothing to rebut this presumption.

Even absent the presumption, plaintiff has demonstrated that they have no compunction against using DoubleClick's business information to compete against it. The damage that could be inflicted upon DoubleClick by defendants' exploitation of their intimate knowledge of DoubleClick's proprietary information is impossible to quantify in dollar terms. Accordingly, an injunction is the appropriate remedy.

### C. *Balance of Equities*

Plaintiff had demonstrated that the balance of equities tips in its favor. DoubleClick operates in a competitive and fast-changing business environment where the use of its proprietary information could cause it real harm. Defendants have not demonstrated that DoubleClick has acted tortiously against them or is otherwise without "clean hands."

By contrast, equity does not favor the employee who seeks to breach his fiduciary duties to his former employer. (*See Kaufman v. International Business Machines Corp.*, 97 A.D.2d 925, 926, *aff'd* 61 N.Y.2d 930.) Here, there is substantial evidence that defendants 1) used DoubleClick's proprietary information to prepare for the launch of Alliance and to position it to compete with DoubleClick, 2) worked on their plans for their new company during working hours at DoubleClick and used resources given to them by DoubleClick to do so, and 3) sought customers and financing for Alliance without regard to their duties to their current employer. Plaintiff has been able to marshall these facts without the benefit of discovery.

Dickey and Henderson are correct that the broad preliminary injunction sought in the complaint would effectively bar them from working in any capacity selling or placing advertising on the Internet, or from even working for a company that engaged in a marginal way in the Internet advertising business. However, apart from references to the fact that Dickey and Henderson are apparently the only bread winners in single-income families, defendants have done nothing to demonstrate what financial hardship they would suffer if the injunction were imposed.

*8 In any event, the injunction set forth below is more narrowly drawn than the preliminary injunction sought in the complaint.

### REMEDY

The parties spend little time in their papers discussing the tailoring of a preliminary injunction. In its reply papers plaintiff scales back its proposed injunction to one "enjoining defendants for a period of at least twelve months from launching a competitive business or from working for a direct competitor of DoubleClick." (Plaintiff's Reply Memorandum of Law at 2.) This language is not sufficiently tailored. Both defendants have



Not Reported in N.Y.S.2d
(Cite as: Not Reported in N.Y.S.2d)

previously worked for companies placing advertisements in other media. Plaintiff's proposed injunction would prevent Dickey and Henderson for working for such a company if it engaged in Internet advertising even as a marginal part of its business. There can be no objection to defendants working for companies that engage in advertising in an array of media, including the Internet, so long as they do not get involved in the company's Internet advertising projects.

Moreover, the one-year period sought by plaintiff is too long. Given the speed with which the Internet advertising industry apparently changes, defendants' knowledge of DoubleClick's operation will likely lose value to such a degree that the purpose of a preliminary injunction will have evaporated before the year is up. Accordingly, the preliminary injunction issued below shall expire after six months from the date of this opinion. Plaintiff may for good cause move to extend the life of the preliminary injunction.

It is hereby ORDERED that:

Defendants are enjoined, for a period of six months from the date of this opinion, from launching any company, or taking employment with any company, which competes with DoubleClick, where defendants' job description(s) or functions at said company or companies include providing any advice or information concerning any aspect of advertising on the Internet. A company shall be presumed to compete with DoubleClick if it provides advertising software, advertising services, or a mix of advertising software and advertising services, to any entity seeking to advertise on the Internet, or to any web site seeking advertisers.

Nothing herein shall be construed to prevent defendants from working for any employer that competes with DoubleClick, so long as defendants' job description(s) or functions with such employer do not include providing advice or information concerning any aspect of advertising on the Internet.

Defendants are also enjoined, for a period of six months from the date of this opinion, from providing any advice or information concerning any aspect of advertising on the Internet to any third parties who 1) work for defendants' employer(s), or 2) provide or promise to provide any of the

defendants with valuable consideration for the advice or information, or 3) share or promise to share any financial interest with any of the defendants.

The parties shall agree to an expedited discovery schedule that shall provide for, *inter alia*, the completion of depositions of Henderson and Dickey, and of two representatives of plaintiff chosen by defendants, within 60 days of the date of this opinion. Other depositions and discovery shall be completed within 5 months of the date of this opinion.

*9 The foregoing constitutes the decision and order of the court.

N.Y.Co.Ct.,1997
DoubleClick Inc. v. Henderson
Not Reported in N.Y.S.2d, 1997 WL 731413
(N.Y.Sup.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 229499 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)
Ρ

Page   1

Herrera v. Clipper Group, L.P.
S.D.N.Y.,1998.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Peony HERRERA, Plaintiff,
v.
The Clipper Group, L.P., Clipper Asset
Management Corporation, CEP Partners, L.P.,
Clipper Capital Corporation, Clipper Capital
Partners, L.P., Clipper Capital Associates, L.P.,
Robert Calhoun and Clipper Capital Associates,
Inc., Defendants.
Peony HERRERA, Plaintiff,
v.
Robert CALHOUN and Bela Schwartz, Defendants.
No. 97-CIV-560 (SAS), 97-CIV-561 (SAS).

May 6, 1998.

Allan R. Freedman, Esq., N.Y., Avrom S. Fischer,
Esq., Brooklyn, for Plaintiff.
Mark A. Jacoby, Esq., Ross E. Morrison, Esq.,
Weil, Gotshal & Manges LLP, New York, for
Defendants.

OPINION AND ORDER
SCHEINDLIN, D.J.
*1 Plaintiff Peony Herrera filed complaints on
January 24, 1997, alleging, *inter alia*, that
defendants discriminated against her in violation of
Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§ 2000e *et seq.* ("Title VII"). Defendants in 96
Civ. 560 (hereinafter "defendants" or "the Clipper
entities") filed an Answer and Counterclaims on
October 7, 1997; this pleading included claims for
misappropriation and breach of fiduciary duty.
Defendants now move for an order (1) granting their
application for attorneys' fees and costs associated
with this motion, (2) disqualifying plaintiff's
counsel and (3) precluding plaintiff from using at
trial certain documents she obtained from defendants
outside the discovery process.   For the following
reasons, this motion is granted in part and denied in
part.

I. Factual Background

On May 23, 1997, defendants served their first
document discovery request. Plaintiff responded by
producing over 3,000 pages of documents, many of

which defendants recognized as having come from
their files. *See* Affidavit of Mark A. Jacoby,
defendants' counsel ("Jacoby Aff.") at ¶¶ 5-6.
Some of the documents produced contained
confidential and/or privileged information, such as
internal financial records and legal advice from
defendants' counsel. *See* Jacoby Aff. at ¶ 7; Reply
Affidavit of Mark A. Jacoby ("Jacoby Rep. Aff.") at
Ex. A, B. At deposition, plaintiff testified that these
items were copies of documents she had made while
in defendants' employ as part of an effort to collect
evidence for this suit.   She had obtained the
documents from defendants' files, their internal
mail, and even from their managers' desk drawers.
*See* Deposition of Peony Herrera, January 19, 1998
("Herrera Dep.") at 16-29, 76.   Plaintiff admitted
that this practice, which had persisted over a
considerable period, had not been revealed to, or
authorized by any supervisor. *See id.* at 71. When
asked by a supervisor, in fact, plaintiff had lied
about her activities. *Id.* at 109.FN1

FN1. The relevant excerpt from plaintiff's
deposition testimony reads as follows:
Q: Can you recall the substance of [the conversation
with your supervisor], if not -
A: The essence of the conversation had something to
do with documents and that I think he was
confirming whether or not [another supervisor] had
spoken to me about copying or taking documents.
Q: He asked you if [the other supervisor] had
spoken to you about taking Clipper documents; is
that correct?
A: That's correct.
Q: And did he also ask you if you had taken any
Clipper documents?
A: Yes, he did.
Q: And what did you say?
A: "Of course not."
Herrera Dep. at 109.

Nor did plaintiff's candor increase once this action
commenced.    Defendants' first discovery request
included a demand for "[a]ll documents which are
the property of Defendants that have been removed
by Plaintiff from Defendants' premises or the
premises of her employment at any time ...." Jacoby
Aff. Ex. B at p. 6. In her response, plaintiff denied
that any such documents existed. *See* Jacoby Aff.
Ex. F, at p. 9.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: Not Reported in F.Supp.)

Plaintiff claims that she has not revealed the contents of the documents to anyone other than her counsel. *See* Herrera Aff. at ¶¶ 7-8.    In her affidavit opposing this motion, however, she revealed the terms of a settlement agreement defendants reached with another Title VII plaintiff. *See id.* at ¶ 19.

## II. Discussion

### A. The Propriety of Plaintiff's Actions

Remarkably, plaintiff maintains that she was justified in appropriating thousands of pages of her employer's confidential files for her personal use. The first issue that must be addressed, therefore, is whether her actions are sanctionable.    It has long been recognized that courts have inherent equitable authority "over their own process, to prevent abuses, oppression, and injustices." *International Products Corp. v. Koons*, 325 F.2d 403, 408 (2d Cir.1963) (quoting *Gumbel v. Pitkin*, 124 U.S. 131, 144, 8 S.Ct. 379, 31 L.Ed. 374 (1888)).    This authority includes the power to sanction parties "who attempt[ ] to use in litigation material improperly obtained outside the discovery process." *Fayemi v. Hambrecht and Ouist, Inc.*, 174 F.R.D. 319, 323 (S.D.N.Y.1997); *Shell Oil Refinery v. Shell Oil Co.*, 143 F.R.D. 105, 108 (E.D.La.1992), *amended by*, Civ. A. No. 88-1935, 1992 WL 275426 (E.D.La. Sept.29, 1992), *amended by*, Civ. A. No. 88-1935, 144 F.R.D. 73 (E.D.La.1992) (plaintiff sanctioned for improperly obtaining proprietary documents from one of defendant corporation's employees).

*2 There is no question here but that the documents produced by plaintiff were improperly obtained. The discovery process is not meant to be supplemented by the unlawful conversion of an adversary's proprietary information.    *See, e.g., Fayemi*, 174 F.R.D. at 325 (plaintiff's unauthorized appropriation of employer's confidential records for use in employment discrimination suit "clearly wrongful"); *Lipin v. Bender*, 84 N.Y.2d 562, 569, 620 N.Y.S.2d 744, 644 N.E.2d 1300 (1994) (plaintiff's theft and subsequent use of clearly privileged memorandum written by defendant's counsel warranted dismissal of complaint). Moreover, plaintiff's behavior was not the product of a momentary lapse of judgment, but of a calculated strategy, carried out over an extended

period.    *Cf. Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F.Supp. 667, 683 (S.D.N.Y.1995) (court declined to sanction plaintiff with dismissal or limitation of damages despite her "questionable" decision to open and copy non-privileged files left in her office in a box with her name on it).    As such, it demonstrates contempt for the discovery process, as well as for plaintiff's duty of loyalty to her employer.FN2  Sanctions are therefore appropriate.

FN2. It is a well established principle of New York law that an employee " 'is prohibited from acting in any manner inconsistent with [her] agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of [her] duties.' " *Doubleclick, Inc. v. Henderson*, No. 116914/97, 1997 WL 731413, at *6 (N.Y.Co.Ct. Nov.7, 1997) (quoting *Lamdin v. Broadway Surface Adv. Corp.*, 272 N.Y. 133, 138, 5 N.E.2d 66 (1936)).    The duty of loyalty requires an employee to act "solely for the benefit of the [employer] in all matters connected with the [employment]." *In re Ivan F. Boesky Sec. Litig.*, 36 F.3d 255, 265 (2d Cir.1994) (internal quotation marks omitted).    An employee who discloses confidential information to third parties to further her own interests at the expense of her employer-i.e. one who behaves as plaintiff did-falls far short of this standard.    *See id.*

Plaintiff's efforts to resist this conclusion are meritless.    First, she argues that her access to the documents in question demonstrates that they were not truly confidential.    *See* Affidavit of Peony Herrera ("Herrera Aff.") at ¶ 4 ("The documents which I produced were not treated as confidential by the Clipper defendants.    The documents were all kept in the files of the accounting and administrative support staff which were not locked and which were never secured.").    Unsurprisingly, she cites no authority to support this novel theory, which amounts to an assertion that anything not nailed down can permissibly be stolen.    *See Furnish v. Merlo*, No. 93-1052-AS, 1994 WL 574137, at *6 (D.Or.1994) (plaintiff's appropriation of her employer's confidential documents wrongful: "Simply because [plaintiff] had a key, did not take originals ... and had work-related access to the documents does not mean that she was authorized to copy the documents, remove them from [the] office, and give them to her attorneys."); *Lipin*, 84 N.Y.2d at 570, 620 N.Y.S.2d 744, 644 N.E.2d 1300 (rejecting plaintiff's argument that defendant's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: Not Reported in F.Supp.)

counsel waived attorney-client privilege by leaving privileged documents on a table in plaintiff's presence). The confidentiality of a document is not waived by its owner's failure to keep it under lock and key.

Second, plaintiff contends that she was given "implied permission" by her superiors to copy the documents. Plaintiff's Memorandum in Opposition to Defendants' Motion for Preclusion and Disqualification ("Pl's Mem.") at 14. This argument is predicated on a meeting Herrera and her then-counsel had with a supervisor and defendants' counsel on June 14, 1996 in which Herrera attempted to demonstrate that minority employees were being treated unfairly using charts containing company-generated salary and bonus information. *See* Herrera Aff. at ¶ 13. The fact that her access to defendants' files was not restricted subsequent to this meeting, she argues, shows that her employers consented to her behavior.

*3 Plaintiffs' admission that she lied about her behavior when questioned by a supervisor, however, is hardly consistent with this theory. In any event, defendants do not dispute that plaintiff had personal knowledge of salary information-she could not have performed her job duties without such knowledge. *See* Reply Affidavit of Bela R. Schwartz in Support of Defendants' Motion for Preclusion and Disqualification ("Schwartz Rep. Aff.") at ¶ 6; Herrera Aff. at ¶ 14. The fact that she used the information known to her to press her discrimination complaint therefore did not put defendants on notice that she was misappropriating documents. Finally, if defendants had responded to plaintiff's charges by limiting her access to documents necessary for the performance of her duties, they would have left themselves extremely vulnerable to a Title VII retaliation claim. *See Davis v. State Univ.,* 802 F.2d 638, 641 (2d Cir.1986) (employer's retaliatory animus demonstrated by evidence that adverse employment decision was made shortly after plaintiff brought discrimination claim). In these circumstances, defendants' inaction cannot be interpreted as tolerance of plaintiff's behavior.

Plaintiff also argues that her actions were made necessary by defendants' covert destruction of documents relevant to her claim.FN3 However, she provides no evidence to support her assertion that any such destruction occurred. She points to the

fact that defendants produced only 300 documents in response to her discovery request, whereas she produced over 3,000, and argues that the difference must have been the result of a coverup. *See* Herrera Aff. at 16. She does not, however, dispute defendants' assertion that they declined to produce those documents they knew were already in plaintiff's possession. *See* Defendants' Response to Plaintiff's Request for Production of Documents at 2-3. Defendants' failure to produce documents she had already taken fails to demonstrate malfeasance on the part of defendants.FN4

FN3. In the exercise of its inherent equitable powers, a court may certainly consider any improper acts of a party seeking sanctions. *See Fayemi,* 174 F.R.D. at 326-27 (plaintiff not sanctioned for his wrongful appropriation of documents where defendant attempted to destroy those documents after being put on notice that the documents were relevant to plaintiff's suit).

FN4. Plaintiff also contends that improper destruction of documents can be inferred from a conversation she had in November, 1995 with one of her supervisors. In that discussion, plaintiff cited several examples illustrating her claim that minority women in the defendants' employ had been subject to disparate treatment in terms of pay. The supervisor responded by asserting that each of the differences plaintiff identified was justified by non-discriminatory considerations. Plaintiff now contends that these explanations were false. This suggests that defendants must have destroyed documents, plaintiff argues, because the supervisor would not have made the misstatements he made had he believed that any contradictory documentary evidence existed. *See* Herrera Aff. at ¶¶ 20-21. This is pure speculation, and highly counter-intuitive speculation at that: The supervisor's allegedly false statements could have been contradicted by the testimony of the women in question (who were presumably quite aware of their job duties and compensation). Given that the documents in question may have been the only source of support for the supervisor's statements, defendants would have had little incentive to destroy them.

B. Appropriate Sanctions

1. Costs of the Motion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: Not Reported in F.Supp.)

Defendants first suggest that plaintiff should be required to compensate them for the costs of bringing this motion. A court's inherent equitable authority includes the power to assess attorneys' fees and costs when a party before it has " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons." ' *First Nat'l Supermarkets, Inc. v. Retail, Wholesale & Chain Store Food Employees Union Local 338,* 118 F.3d 892, 898 (2d Cir.1997) (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45-46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). An imposition of sanctions pursuant to this power must be accompanied by specific factual findings regarding (1) the misconduct in question and (2) the proportion of the adversary's fees that is attributable to that misconduct. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.* 98 F.3d 13, 21 (2d Cir.1996).

I have little trouble concluding that plaintiff here acted in bad faith. First, she deliberately subverted the discovery rules of this court by secretly misappropriating thousands of pages of documents, many of which contained clearly confidential information. Second, she lied about this course of conduct, both to her supervisors and in her response to defendants' discovery request. Finally, she disclosed defendants' confidential information in a publicly-filed affidavit. As discussed above, plaintiff proffers no colorable arguments to support her assertion that these acts were justified. Rather, it is apparent that they were motivated by a desire to evade the discovery process in order to gain a tactical advantage in this litigation. *See United States v. International Bhd. of Teamsters,* 948 F.2d 1338, 1345 (2d Cir.1991) (acts are sanctionable when they are "entirely without color, and are taken for reasons of harassment or delay or for other improper purposes") (internal quotation marks omitted)). It is also clear that the costs of this motion are, in their entirety, attributable to plaintiff's misconduct. *Cf. Ostano Commerzanstalt v. Telewide Systems, Inc.,* 880 F.2d 642, 650 (2d Cir.1989) (action remanded when district court awarded plaintiffs' attorneys all their fees, though sanctionable acts only related to one of the exhibits presented at trial). I therefore find that the expenses defendants incurred in making this motion should be borne by plaintiff.FN5

FN5. Defendants should present plaintiff with an invoice for the expenses incurred in making this

motion. If the parties cannot agree on the proper amount of compensation, defendants must submit a fee application to the Court no later than June 15, 1998.

B. Disqualification of Counsel

*4 Defendants next request that plaintiff's counsel be disqualified from representing plaintiff in these actions. This sanction is necessary, they argue, to prevent plaintiff's counsel from acting as "unsworn witnesses" at trial, particularly with regard to defendants' breach of fiduciary duty and misappropriation counterclaims. As the Second Circuit has explained:

An attorney acts as an unsworn witness when his relationship to his client results in his having first-hand knowledge of the events presented at trial. If the attorney is in a position to be a witness, ethical codes may require him to withdraw his representation. Even if the attorney is not called, however, he can still be disqualified, since his performance as an advocate can be impaired by his relationship to the events in question. For example, the attorney may be constrained from making certain arguments on behalf of his client because of his own involvement, or may be tempted to minimize his own conduct at the expense of the client. Moreover, his role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross-examination.

*United States v. Locascio,* 6 F.3d 924, 933 (2d Cir.1993) (citations omitted). Defendants suggest that both the dangers described in this passage will be present if plaintiff's counsel are allowed to remain in the case. First, counsel may be tempted to minimize their own role in plaintiff's appropriation of documents in order to avoid disciplinary sanctions. Second, counsel may be able to prejudice defendants by conveying to the jury their own views of the propriety of plaintiff's conduct without undergoing the rigors of cross-examination.

The problem with these arguments is that here, unlike in *Locascio,* there are virtually no factual issues left to be resolved with regard to the claims in question.FN6 Plaintiff has admitted taking the documents without authorization. At least some of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: Not Reported in F.Supp.)

those documents were clearly confidential. The only potentially disputed issue of fact remaining on defendants' breach of fiduciary duty and misappropriation counterclaims, therefore, would appear to be the extent of defendants' damages, a subject upon which plaintiff's counsel would have no first-hand knowledge. Similarly, plaintiff's counsel would appear to have little ability to minimize their role in plaintiff's activities even if they were tempted to do so for fear of disciplinary proceedings: They concede that they were fully aware of their client's behavior from its inception. Thus, while plaintiff's counsel have first-hand knowledge of relevant information, this knowledge is unlikely to lead to a situation at trial that would cause prejudice to either party. *See United States v. Isaacson,* 853 F.Supp. 83, 87-88 (E.D.N.Y.1994) (defendant's counsel not disqualified when defendant's admissions rendered potential conflict of interest unlikely). In these circumstances, granting defendants the "drastic remedy" of disqualification would be inappropriate. *Locascio,* 6 F.3d at 934.

FN6. *See* 6 F.3d at 933 (defendant's counsel disqualified when he possessed personal knowledge of *disputed* facts). The other cases cited by defendants are identical in this regard. *See United States v. McKeon,* 738 F.2d 26, 35 (2d Cir.1984); *United States v. Cruz,* 94 Cr. 313, 1995 WL 463107, at *2 (S.D.N.Y. Aug.4, 1995).

C. Preclusion

*5 Defendants also suggest that plaintiff should be precluded from using any non-public business information contained in the documents she misappropriated. In many cases, preclusion is an appropriate sanction when evidence has been wrongfully obtained. *See, e.g., Shell Oil,* 143 F.R.D. at 108-09. Here, however, the sanction I have already imposed-reimbursement to defendants for the costs of this motion-is a sufficiently severe punishment to deter plaintiff from engaging in future misdeeds. Moreover, granting the relief requested would be sure to lead to innumerable disputes as to whether particular items of information were publicly available, and if not, whether plaintiff nevertheless obtained them from an untainted source. Finally, plaintiff could have properly obtained the clear majority of the documents through the discovery process had she consented to a reasonable confidentiality agreement.

Preclusion would therefore not merely punish her, but would grant defendants a windfall strategic advantage as well. Without knowing what value the information at issue has for plaintiff's case, I am reluctant to grant them this advantage. For all these reasons, I decline to prohibit plaintiff from using otherwise discoverable information in these actions, in spite of her improper efforts in obtaining it.

III. Conclusion

In secretly copying thousands of pages of documents belonging to defendants, at least some of which were clearly confidential, plaintiff improperly attempted to evade this court's discovery rules. She exhibited further bad faith in lying to a supervisor about her behavior, responding falsely to defendants' request for documents, and disclosing confidential information in a publicly-filed document. Furthermore, the justifications she now offers for her actions are entirely without merit. Plaintiff is therefore ordered to compensate defendants for the costs incurred in making this motion. Her counsel, however, are not disqualified from representing her in these actions, and she is not precluded from using in these actions any non-privileged information she obtained from defendants.

SO ORDERED:

S.D.N.Y.,1998.
Herrera v. Clipper Group, L.P.
Not Reported in F.Supp., 1998 WL 229499 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

