PROSKAUER ROSE LLP
Steven M. Kayman (SK-8123)
Lloyd B. Chinn (LC-7953)
Brian S. Rauch (BR-5784)
1585 Broadway
New York, New York 10036
(212) 969-3000
Attorneys for Plaintiff
Houlihan, Lokey, Howard & Zukin, Inc.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HOULIHAN, LOKEY, HOWARD & ZUKIN, INC.,

                    Plaintiff,

        - against -

LORRE JAY,

                    Defendant.

---

07 CV - 4782 (LTS)

**DECLARATION OF MICHAEL FAZIO**

        I, Michael Fazio, declare under the penalty of perjury under the laws of the United Sates of America, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information and belief:

        1.        I am the Head of the New York Financial Advisory Services ("FAS") group for Plaintiff Houlihan, Lokey, Howard & Zukin, Inc. ("Houlihan"). Defendant Lorre Jay worked under my supervision prior to her voluntary resignation from Houlihan on May 23, 2007 to join Duff & Phelps.

        2.        I submit this declaration in support of Houlihan's application for a temporary

CURRENT 9729349v7

restraining order, preliminary injunction and expedited discovery. The statements made in this

declaration are made on personal knowledge or are based on my review of Houlihan documents

or conversations with co-workers.

3.      Houlihan is a California corporation with a New York office at 245 Park Avenue

in Manhattan, New York. Houlihan is an international investment bank providing a wide range

of services, including financial valuations, opinions and advisory services.

4.      Houlihan hired Lorre Jay on or about February 1, 2000 as a Senior Vice President

in the FAS group.

5.      The FAS group services a wide-range of clients by providing valuation opinions

in a non-transactional context and financial opinions (including fairness, valuation and solvency

opinions) in a transactional context. Jay specialized in tax and financial reporting valuation

opinions but also performed other tasks for clients.

6.      On January 6, 2000, in conjunction with the commencement of her employment,

Jay executed a Proprietary Information and Developments Agreement with Houlihan providing,

in relevant part:

> 1. Proprietary Information. For purposes of this Agreement,
> "Proprietary Information" means information that (a) is not known
> by actual or potential competitors of the Company or is generally
> unavailable to the public, (b) has been created, discovered or
> developed by, or otherwise become known to, the Company
> (including confidential information regarding the Company's
> clients or prospective clients) or in which property rights have been
> assigned or otherwise conveyed to the Company, and/or (c) has
> material economic value or potential material economic value to
> the Company's present or future business....

CURRENT 9729349v7

2. <u>Nondisclosure of Proprietary Information</u>. At all times, both during my employment and after the cessation of my employment, whether the cessation is voluntary or involuntary, I shall (a) keep in confidence all Proprietary Information, and (b) not disclose or use, or assist in the use or disclosure of, any Proprietary Information, except as may be necessary in the legitimate and ordinary course of performing my duties as an employee of the Company, without the Company's prior written consent.

3. <u>Confidential Information of Third parties</u>. The Company has received, and in the future will receive, confidential or proprietary information from or regarding the Company's clients, prospective clients and other third parties, subject to the Company's duty to maintain the confidentiality of such information and to use it only for certain limited purposes. In connection therewith, I shall not disclose or use, or assist in the use or disclosure of, any such confidential or proprietary information without the Company's prior written consent, except as may be necessary in the legitimate and ordinary course of performing my duties as an employee of the Company, but nevertheless consistent with the Company's agreement to maintain the confidentiality of such information....

5. <u>Conflicting Employment; Business Opportunities</u>. During my employment, I shall... (b) promptly disclose to the Company all business opportunities that are (i) presented to me in my capacity as an officer or employee of the Company, and (ii) of a similar nature to the Company's existing business or a type of business the Company is currently developing, and (c) not usurp or take advantage of any such business opportunity without first offering such opportunity to the Company....

8. <u>Termination of Employment</u>. Upon termination of my employment for whatever reason, I shall neither take nor allow a third party to take, and I shall deliver to the Company, all original copies and all reproductions of all Proprietary Information, including, without limitation, all records, reports, notebooks, proposals, client lists, correspondence, documents, computer diskettes, notes, tapes or other electronic recordings, programs, data, or other materials or property of any nature belonging to the Company or pertaining to my work with the Company.... [t]he terms and conditions of this Agreement shall continue to apply after termination of my employment....

9. <u>Injunctive Relief; Attorneys' Fees</u>. If I breach (or threaten to breach) this Agreement, the Company shall be entitled to enjoin such breach and, in furtherance thereof, an injunction may be granted by any court of competent jurisdiction. If either party to

3

> this Agreement brings an action to enforce the terms hereof or
> declare rights hereunder, the prevailing party in any such action
> shall be entitled to recover its, his or her reasonable attorneys' fees
> from the other party as fixed by the Court.

A copy of the complete executed Proprietary Information and Developments Agreement is attached hereto as Exhibit A.

7.      On January 1, 2003, Houlihan promoted Jay to the position of Director – a title she held until her resignation.

8.      As a highly compensated Director in Houlihan's FAS group, Jay had relationship responsibility for a significant number of clients (amounting to approximately $5 million per year in revenue to Houlihan) and had a three person dedicated team working for her, as well as many additional people working under her direction on specific projects.

9.      In total compensation over the course of her last full year of employment – a fifteen month year for Houlihan due to a change in its fiscal calendar – Houlihan paid Jay $684,270 in cash, $10,917 in stock and $67,813 in deferred compensation subject to future vesting. As of April 1, 2007, Houlihan paid Jay an annual salary of $170,000 payable monthly at the end of each month. On April 30th, 2007, Houlihan paid Jay a cash bonus of $353,739 and previously deferred compensation with a value of $10,917 in the form of stock.

10.     Jay informed me of her intention to resign on May 23, 2007 with her final date of employment to be on May 31, 2007. She told me she was resigning to accept a position as a Managing Director at Duff & Phelps. Because she was going to a competitor, I instructed Jay not to contact any clients regarding her departure, and Jay assured me that she would not do so and had not done so up to that point. I also reminded Jay of her responsibilities regarding

4

confidential and proprietary information, responsibilities that she acknowledged. I thought we had a productive meeting, and it concluded by our agreeing to work together to accomplish a professional and cordial parting of the ways.

11.    Subsequent to this meeting, Houlihan performed a search of Jay's e-mail sent on her Houlihan account to and from her Houlihan computer. Unfortunately, we found that Jay had stolen extensive confidential and proprietary information by transferring Houlihan files to her home computer and e-mail account.

12.    Based on information currently available to us, since at least April 9, 2007 and continuing on a regular basis up to and including May 24, 2007, Jay e-mailed to her personal e-mail account numerous confidential and proprietary documents belonging to Houlihan including confidential information for and about Houlihan clients. These documents included listings of Jay's projects (including client information) since January 2005, confidential valuation opinions, reports, models, retainer agreements, proposals, client presentations, contact information letters, Houlihan standard practices with respect to almost all aspects of the FAS group's services, sample reports and studies. In all, since April 9, 2007 Jay forwarded approximately 115 business related e-mails to her personal e-mail address. These e-mails to her personal e-mail account included approximately 378 confidential Houlihan documents. A sample of these e-mails containing attachments is attached hereto as Exhibit B. (To maintain the confidentiality of these documents, just the cover e-mail and not the actual attachments are included in this exhibit.)

13.    Houlihan takes extensive measures to protect its valuable confidential and proprietary business information. All Houlihan employees are required to execute a Proprietary Information and Developments Agreement (substantially identical to the agreement described

5

above signed by Jay). The Proprietary Information and Developments Agreement requires that employees protect Houlihan's proprietary information, both during and after their employment with Houlihan, and includes a number of provisions to ensure such protection. Houlihan also typically executes confidentiality agreements with its clients that set forth the precise manner in which Houlihan is to treat confidential and proprietary information generated during the course of an engagement. (Houlihan's model for a standard confidential agreement with a client is attached hereto as Exhibit C, which Jay has executed on behalf of Houlihan on various occasions.) Client work product is generally disseminated within the firm only on a "need to know" basis. Finally, Houlihan's computer systems are designed to prevent unauthorized access to electronically stored documents: a password is required to access the system; certain information has restricted access and documents can be individually protected.

14.     The documents Jay sent to her personal e-mail address are extremely confidential and proprietary. Many of these documents are not only Houlihan's proprietary and confidential information, they are also the proprietary information of specific Houlihan clients (and protected as such by confidentiality agreements with those clients). The documents include confidential retainer letters that would enable a competitor like Duff & Phelps to see the specific services being performed by Houlihan for a particular client and how Houlihan prices engagements with clients (and thereby gain an unfair competitive advantage, as Houlihan is not privy to Duff & Phelps' pricing). The documents include final reports and opinion letters to clients containing sensitive valuation data (that could be used to the detriment of our clients by their competitors), confidential client files entrusted to Houlihan by its clients for the sole purpose of performing requested work and confidential deal summaries. Houlihan clients would likely be very concerned to learn that their confidential and proprietary information has been removed from

6

Houlihan.

15.    The documents taken by Jay also contain Houlihan manuals that detail practically every aspect of the way in which Houlihan serves its FAS clients – from billing rates to retainer letters to the creation of different valuation reports and opinion letters – that could be used to attempt to mimic Houlihan's work processes and/or pre-empt Houlihan in informing potential clients about our processes. Finally, the documents removed by Jay include studies of particular topics prepared by Houlihan, studies that are used to develop business among a select clientele. While it would be difficult to place a specific dollar figure on the cost to Houlihan for preparing each of these individual documents, taken together, these documents represent a substantial body of work to which Houlihan devoted an extraordinary amount of resources. For these materials to be given over to a direct competitor would be potentially devastating to Houlihan's ability to compete with that firm.

16.    One of the documents Houlihan recovered from Jay's computer is a May 22, 2007 executed offer letter from Duff & Phelps to Jay. It contains, as an attachment, a list of twenty-six Houlihan clients. These twenty-six clients represent the majority of the Houlihan clients for whom Jay had primary responsibility in her last year with Houlihan. When Jay commenced her Houlihan employment, she did not "bring" any of these listed clients to Houlihan. Although Jay had primary responsibility for the clients on this list at the time she resigned from Houlihan, most had been referred to her by other Houlihan employees. The twenty-six clients on this list represented approximately $2.4 million in revenue to Houlihan in the last year. Upon information and belief, Jay has disclosed other information about these and other Houlihan clients to Duff & Phelps.

7

17.    On information and belief, in the days prior to her May 23, 2007 meeting with me, Jay solicited at least one employee member of her dedicated team at Houlihan's New York office's FAS group to join her at Duff & Phelps.

18.    On information and belief, both prior and subsequent to her meeting with me, Jay called many of the Houlihan clients for whom she had responsibility to inform them of her impending departure and to solicit them, directly or implicitly, to provide business to her at Duff & Phelps.  Jay followed up these telephone conversations with e-mails in which she confirmed the conversations and provided her interim contact information to the clients.  Jay contacted a minimum of seven Houlihan clients and, on information and belief, contacted many more than that.  Attached hereto, as Exhibit D, are examples of some of the e-mails sent to Houlihan clients by Jay memorializing such telephone conversations.

19.    On information and belief, Jay diverted or attempted to divert potential business from Houlihan to herself and to Duff & Phelps by "warehousing" referrals from Houlihan referral sources until she began work at Duff & Phelps.  One example of Jay diverting potential business is memorialized in an e-mail that is attached hereto as Exhibit E.  As is clear from this e-mail, Jay received a lead for potential business to perform a transactional valuation for a company – the type of valuation that Houlihan performs regularly.  Jay informed the referral source that she would be interested in the opportunity, and provided her cell phone number for the potential to client to contact her, instead of her Houlihan contact number.   Jay never informed me or, on information and belief, anyone else at Houlihan about the business opportunity described in this e-mail.

20.    On May 24, 2007, after discovery of these very disturbing e-mails, we instructed

8

Jay to stop coming into office.  Houlihan immediately terminated Jay's access to its computer

systems in an effort to preserve evidence and protect itself from further misappropriations by

Jay.  The next day, May 25, 2007, Christopher Crain, Houlihan's General Counsel, and Jack

Berka, a Senior Managing Director of Houlihan and the global head of its FAS group,

telephoned Jay at her home to confront Jay with what she had done and attempt to reach a non-

litigated resolution.  Among other things, Houlihan demanded the supervised destruction of all

Houlihan confidential information present on Jay's personal computer and personal e-mail

account and an inspection of Jay's computer by IT personnel to ensure that she did not transfer

the confidential information to Duff & Phelps or any other third party.

21.    On May 31, 2007, because Jay had still not responded to our demands and offer,

Houlihan's outside legal counsel sent Jay a letter demanding that Jay "preserve without deletion

or modification of any kind all computer records containing Houlihan documents and all other

relevant evidence in [her] possession."  In an e-mail to Houlihan later that day, which was

transferred to me, Jay said that she had taken it upon herself to delete from her personal

computer all electronic files she had take from Houlihan.


Executed on: _6/4/07_

_____
Michael Fazio

9

Exhibit A

# PROPRIETARY INFORMATION AND
# DEVELOPMENTS AGREEMENT

This Proprietary Information and Developments Agreement (this "Agreement") is made by the undersigned employee for the benefit of, and in connection with such employee's employment by, Houlihan, Lokey, Howard & Zukin, Inc., a California corporation (together with its subsidiaries and affiliated companies, the "Company").

## RECITALS

A.    During the course of my employment, I (i) will have access to Proprietary Information (as hereinafter defined), the disclosure or misuse of which may materially, adversely and irreparably affect the Company, and (ii) may develop or create formulas, software programs, processes, techniques, data, lists and the like.

B.    This Agreement confirms that (i) I will maintain the confidentiality of the Proprietary Information, and will only use such information for the exclusive benefit of the Company, (ii) all Developments (as hereinafter defined) will be owned by the Company, and (iii) the agreements set forth herein are a material part of the consideration for my continued employment by the Company.

## AGREEMENT

In light of the above Recitals, and in consideration of my continued employment by the Company, and the compensation received by me from time to time (including any discretionary bonuses awarded to me at the end of this year or ensuing years) from the Company, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I hereby agree as follows:

1.    <u>Proprietary Information.</u>  For purposes of this Agreement, "Proprietary Information" means information that (a) is not known by actual or potential competitors of the Company or is generally unavailable to the public, (b) has been created, discovered or developed by, or otherwise become known to, the Company (including confidential information regarding the Company's clients or prospective clients) or in which property rights have been assigned or otherwise conveyed to the Company, and/or (c) has material economic value or potential material economic value to the Company's present or future business. Proprietary Information shall include, without limitation, trade secrets and all other inventions, formulas, compilations, forecasts, software programs, data, databases, directories, research, and client lists, and any modifications or enhancements of any of the foregoing, and all program, marketing, sales or other financial or business information disclosed to me by the Company, either directly or indirectly, in writing, electronically, orally, by my own observation, or through any other medium, which has actual or potential economic value to the Company. All Proprietary Information shall be the sole property of the Company, and the Company shall be the sole owner of all patents, copyrights and other rights in connection therewith.

Page 1

2. <u>Nondisclosure of Proprietary Information</u>.  At all times, both during my employment and after the cessation of my employment, whether the cessation is voluntary or involuntary, I shall (a) keep in confidence all Proprietary Information, and (b) not disclose or use, or assist in the use or disclosure of, any Proprietary Information, except as may be necessary in the legitimate and ordinary course of performing my duties as an employee of the Company, without the Company's prior written consent.

3. <u>Confidential Information of Third Parties</u>.  The Company has received, and in the future will receive, confidential or proprietary information from or regarding the Company's clients, prospective clients and other third parties, subject to the Company's duty to maintain the confidentiality of such information and to use it only for certain limited purposes. In connection therewith, I shall not disclose or use, or assist in the use or disclosure of, any such confidential or proprietary information without the Company's prior written consent, except as may be necessary in the legitimate and ordinary course of performing my duties as an employee of the Company, but nevertheless consistent with the Company's agreement to maintain the confidentiality of such information.

4. <u>Developments.</u> All discoveries, improvements, inventions, formulas, processes, designs, techniques, know-how, data and computer programs (whether or not patentable, copyrightable or susceptible to other form of protection), made or conceived or reduced to practice or developed by me, either alone or jointly with others, during the term of my employment (collectively, "Developments") shall be the sole property of the Company, including all patents, copyrights, intellectual property or other rights related thereto, and I hereby assign to the Company all rights (if any) that I may have or acquire in such Developments. The foregoing assignment shall <u>not</u> require me to assign my rights in any inventions excluded under the provisions of California Labor Code Section 2870, the terms of which are set forth on Exhibit A attached hereto. I further understand that I bear the burden of proving that a Development qualifies under said Section 2870.

5. <u>Conflicting Employment; Business Opportunities</u>.  During my employment, I shall (a) not directly or indirectly engage in any employment, consulting, or other business activity in competition with the Company, (b) promptly disclose to the Company all business opportunities that are (i) presented to me in my capacity as an officer or employee of the Company, and (ii) of a similar nature to the Company's existing business or a type of business the Company is currently developing, and (c) not usurp or take advantage of any such business opportunity without first offering such opportunity to the Company. The foregoing provisions shall neither require me to disclose to the Company, nor prohibit me from taking advantage of, any opportunity to make a passive investment in or with any person or entity which is not affiliated with a client or prospective client of the Company.

6. <u>Prior Employment</u>.  During my employment, I shall not use any confidential, proprietary or trade secret information of a former employer (which, for purposes of this Agreement, shall include persons, corporations and other entities for which I have acted as an independent contractor or consultant), unless I obtain such former employer's prior written consent. I hereby represent that

I am not a party to any agreement which contains a non-competition, non-solicitation or other restrictive provision which could materially affect my employment by the Company, or the performance of my duties to the Company. I shall indemnify and hold the Company harmless from and against any and all losses, claims, causes of action, liabilities, damages, costs and expenses (including reasonable attorneys' fees) arising from by breach of the terms of this paragraph 6..

7. <u>At-Will Employment</u>.  My employment with the Company is at-will. This means that I may terminate my employment with the Company at any time, with or without cause, and with or without notice. Likewise, the Company may terminate my employment at any time, with or without cause, and with or without notice. This at-will relationship may not be modified or changed during my employment with the Company, except by a written agreement with the Company, signed by a Member of the Board of Directors. As such, I understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, nor to my employment for any particular term.

8. <u>Termination of Employment</u>.  Upon termination of my employment for whatever reason, I shall neither take nor allow a third party to take, and I shall deliver to the Company, all original copies and all reproductions of all Proprietary Information, including, without limitation, all records, reports, notebooks, proposals, client lists, correspondence, documents, computer diskettes, notes, tapes or other electronic recordings, programs, data, or other materials or property of any nature belonging to the Company or pertaining to my work with the Company. Notwithstanding the foregoing, I shall be allowed to retain a duplicate copy of the names, addresses, telephone and facsimile numbers, relating to clients and business contacts who know me personally that I maintain in various forms, including personal databases and rolodexes. Unless otherwise specified herein, the terms and conditions of this Agreement shall continue to apply after termination of my employment, and to any period during which I perform services for the Company as a consultant or independent contractor. Upon termination of my employment, I will be asked to attend an exit interview and to sign and deliver a "Termination Certificate," the form of which is attached hereto as Exhibit B. My failure to sign the Termination Certificate, however, shall not affect my obligations under this Agreement. Consistent with the terms of this Agreement, nothing contained herein shall be construed as a prohibition on my right, from and after the termination of my employment, to (a) take part as an employee, consultant, owner or in any other capacity in, for or with any person, company or enterprise engaged in investment banking or related services, or (b) use and employ my general knowledge and individual skills in any future endeavor.

9. <u>Injunctive Relief; Attorneys' Fees</u>. If I breach (or threaten to breach) this Agreement, the Company shall be entitled to enjoin such breach and, in furtherance thereof, an injunction may be granted by any court of competent jurisdiction. If either party to this Agreement brings an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action shall be entitled to recover its, his or her reasonable attorneys' fees from the other party as fixed by the Court.

10. <u>Severability</u>.  If and to the extent that any portion of this Agreement is held to be invalid or unenforceable or would otherwise render this Agreement invalid or unenforceable, I agree that such portion shall be severable from this Agreement, and such invalidity or unenforceability shall

not have any effect on the remaining paragraphs, clauses or provisions of this Agreement. In the event that this Agreement is not enforceable in any particular city, county or state, I agree that such areas shall be severable from this Agreement, and this Agreement shall continue to be enforceable in all other areas.

11.  <u>General Provisions</u>.  If or to the extent there is any inconsistency between the terms of this Agreement and any prior employment-related confidentiality agreement signed by me for the Company's benefit,, the terms of this Agreement shall govern. Subject to the preceding sentence, this Agreement shall be in addition to, and not in lieu of, any written employee policies (including those set forth in the Employee Handbook) that may be promulgated from time to time by the Company regarding the subject matter hereof and any applicable laws or regulations (including those regarding misappropriation of trade secrets and unfair competitive practices), and shall not waive or amend any other written agreements I have entered or may enter into with, or for the benefit of, the Company (including those regarding any investment in the Company or its affiliated entities). No waiver of any breach of any term or provision of this Agreement shall be a waiver of any other breach of this Agreement. No waiver shall be binding unless in writing and signed by the party waiving the breach. This Agreement may be modified only in writing. This Agreement shall be binding upon me, my heirs, executors, assigns and administrators, and shall inure to the benefit of the Company, its successors and assigns. This Agreement shall be construed in accordance with the laws of the State of California (without reference to the conflicts of laws provisions thereof).

By: _Lorre J. Jay_____

Print Name: _Lorre  F.  Jay_____

Date:_1/6/2000_____


Accepted by:

**HOULIHAN, LOKEY, HOWARD & ZUKIN, INC.,**
a California corporation

By:_____

Print Name: _John  Maurcdakis_____

Title: _Managing  Director_____

Date:__FEB 09 2000_____


Revised November 1998/April 1999

**EXHIBIT A**

**CALIFORNIA LABOR CODE SECTION 2870**

Section 2870 of the California Labor Code provides as follows:

(a)  Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)  Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)  Result from any work performed by the employee for the employer.

(b)  To the extent a provision in any employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

## EXHIBIT B

## TERMINATION CERTIFICATE

The undersigned hereby certifies as follows:

1.   When I signed the Proprietary Information and Developments Agreement dated as of _____ (the "Agreement"), I read and understood the terms contained therein. I have now reviewed the Agreement again as part of my exit interview, and fully understand the terms thereof and my continuing obligations thereunder, including my obligations (a) not to use for personal benefit or disclose to others any Proprietary Information (as defined in the Agreement), and (b) to assign to the Company all rights (if any) that I may have acquired in any Developments (as defined in the Agreement).

2.   I have fully complied with the terms of the Agreement, including the return of any documents and other tangible materials of any nature pertaining to my employment by Houlihan, Lokey, Howard & Zukin, Inc. (the "Company").

3.   I recognize that the unauthorized taking of any Proprietary Information or Developments is a crime under the California Penal Code, and that any unauthorized taking of Proprietary Information or Developments may also result in civil liability under the California Civil Code.

4.   The Company may notify my new employer of (a) the general nature or subject matter of the Proprietary Information (without actually disclosing such Proprietary Information) to which I had access while employed by the Company, and (b) my continuing obligations under the Agreement to keep such Proprietary Information in confidence, and not to disclose or use such Proprietary Information without the Company's prior written consent.

5.   Attached hereto is a complete list of all Developments which, under the terms of the Agreement, I have assigned to the Company. If no such list is attached, I represent that during my employment I did not make, conceive, reduce to practice or develop, either alone or jointly with others, any Developments.

6.   I understand and acknowledge that should I fail to comply with my obligations under the Agreement, the Company shall have, in addition to a claim for damages, the right to obtain an injunction prohibiting me from disclosing Proprietary Information to a third party or using any Developments.

By: _____          Witnessed by: _____

Print Name: _____          Print Name: _____

Date: _____          Date: _____

Exhibit B

**From:**                            Jay, Lorre F. [LJay@HLHZ.com]
**Sent:**                           Monday, April 09, 2007 3:45 PM
**To:**                               tgwalker@optonline.net

**Attachments:**                LJay doc.doc; Jay updated transaction list.doc


LJay doc.doc (46 KB)


Jay updated transaction list.d...

Lorre F. Jay
Director
Houlihan Lokey
245 Park Ave., 20th Floor
New York, New York  10167
(212) 497-4184 tel
(212) 497-7860 fax
ljay@hlhz.com

**From:**          Jay, Lorre F. [LJay@HLHZ.com]
**Sent:**          Wednesday, April 11, 2007 4:38 PM
**To:**            tgwalker@optonline.net

**Attachments:**   LJay doc.pdf; L Jay updated transaction list.pdf

  

LJay doc.pdf (21      L Jay updated
      KB)          transaction list...

Here's the stuff
Lorre F. Jay
Director
Houlihan Lokey
245 Park Ave., 20th Floor
New York, New York  10167
(212) 497-4184 tel
(212) 497-7860 fax
ljay@hlhz.com

**From:**        ljay@hlhz.com
**Sent:**        Wednesday, April 18, 2007 4:09 PM
**To:**          tgwalker@optonline.net
**Subject:**     info

File(s) will be available for downloads until 02 May 2007:

Attachment.     2005 Valpak v8.xls, 2,562.00 KB
Attachment:     2005 Retainer Agreement.pdf, 159.44 KB
Attachment:     2006 Report_CLIENT FINAL_05-18-06.pdf, 414.04 KB
Attachment:     2006 Report v1.6_Client Final_UPDATED.doc, 5,915.50 KB
Attachment:      - EY Audit Review Questions v 2 - RESPONSES.doc, 50.00 KB
Attachment: Signed Engagement Letter_FINAL.pdf, 370.33 KB
Attachment:       Report_FINAL.pdf, 661.77 KB
Attachment: Downside & BaseCase Model_v3.xls, 12,064.50 KB
Attachment:       Valuation_v12.xls, 3,403.50 KB
Attachment: Comps Comparison 05 vs 06.xls, 128.00 KB

**REDACTED**

**From:**          Jay, Lorre F. [LJay@HLHZ.com]
**Sent:**          Wednesday, April 18, 2007 5:07 PM
**To:**            Tom and Lorre Walker
**Subject:**       stuff

**Attachments:**          PPA Report vFINAL.pdf;          PPA_v3.pdf

          

PPA Report          PPA_v3.pdf (39...
vFINAL.pdf (...

Lorre F. Jay
Director
Houlihan Lokey
245 Park Avenue, 20th Floor
New York, New York  10167
(212) 497-4184 tel
(212) 661-6278 fax
ljay@hlhz.com

**REDACTED**

**From:**       ljay@hlhz.com
**Sent:**       Thursday, April 19, 2007 12:49 PM
**To:**         tgwalker@optonline.net
**Subject:**    info

Here's the relevant info

File(s) will be available for downloads until 03 May 2007:

Attachment:     Solvency_Dec2006_Final.pdf, 460.85 KB
Attachment:     Solvency_Dec2006_v14.doc, 2,261.00 KB
Attachment:     Equity Allocation Model_Dec 2006_New Breakpoint v.3.xls, 411.00 KB
Attachment:     Equity Opinion Letter and Exhibits 3.12.2007.pdf, 290.17 KB
Attachment      Dec 2006 Equity Opinion Letter Final Mar 12 2007 clean.doc, 144.50 KB
Attachment:     Solvency Opinion Dec 2006 Final 1.22.07.pdf, 352.78 KB
Attachment: Solvency Opinion Dec 2006 Final 1.22.07.doc, 48.50 KB
Attachment      Dec06 Equity Val T=0.5.pdf, 11.12 KB
Attachment      Dec06 Equity Val T=5.pdf, 11.12 KB
Attachment: IRR Model-1-15-07_Equity Allocation.xls, 359.50 KB

**REDACTED**

From:          ljay@hlhz.com
Sent:          Monday, April 23, 2007 11:39 AM
To:            tgwalker@optonline.net
Subject:       info

File(s) will be available for downloads until 07 May 2007:

Attachment:        Report Draft 11.21.06.pdf, 447.68 KB
Attachment:        Equity Allocation Model_Sept2006_v1.xls, 431.50 KB
Attachment:        PCS - November 2006_v61.xls, 3,996.00 KB
Attachment:        Report 05.27.06_06.05.06.pdf, 777.02 KB
Attachment:        Final Report.pdf, 700.00 KB
Attachment:        Report vFINAL.pdf, 752.06 KB
Attachment:        Final Report 6.30.06.pdf, 405.23 KB
Attachment:        Report FINAL.pdf, 454.75 KB
Attachment:        final signed retainer.pdf, 404.28 KB
Attachment:        final signed retainer.pdf, 410.30 KB

**REDACTED**

**From:**      Jay, Lorre F. [LJay@HLHZ.com]
**Sent:**      Monday, April 23, 2007 12:04 PM
**To:**      tgwalker@optonline.net
**Subject:**      FW: CFO Attendee List

**Attachments:**      CFO-Attendee List.xls



CFO-Attendee
List.xls (83 KB)

---

**From:** Keeley, Kara
**Sent:** Thursday, April 12, 2007 12:05 PM
**To:** De Rose, Richard; Jay, Lorre F.
**Subject:** CFO Attendee List

Hello,

I have attached the attendee list from yesterday's event.

How was the event?

Please let me know at your earliest possible convenience.

Best,
Kara


**Kara Keeley**
**Speakers Bureau/Events Associate**
**Houlihan Lokey**
**1930 Century Park West**
**Los Angeles, CA 90067**
**P: 310-789-5729**
**F: 310-556-3887**
**kkeeley@hlhz.com**

---

**From:** Missy Quinn [mailto:mquinn@execforum.net]
**Sent:** Thursday, April 12, 2007 7:50 AM
**To:** Keeley, Kara
**Subject:** Thank you

Dear Kara,

Thank you very much for your support of the 2007 CFO Leadership Forum.  Attached is the confidential full listing of all registered attendees (includes name, title, company address and phone numbers), as per the sponsorship agreement.  It was great working with you on this event, if any of our future events look interesting to you, feel free to get in touch.


Best,

Missy Quinn

Event Management
Argyle Executive Forum
122 East 57th Street
New York, NY 10022
p:(646) 839-0022
f: (646) 219 - 7860
mquinn@execforum.net
www.execforum.net

**From:**          ljay@hlhz.com
**Sent:**          Tuesday, April 24, 2007 2:20 PM
**To:**            twalker@optonline.net
**Subject:**       Info

File(s) will be available for downloads until 08 May 2007:

Attachment:              Final.pdf, 1,119.36 KB
Attachment:              Valuation DRAFT 04.06.2007.pdf, 1,013.96 KB
Attachment:              Valuation Dec_v10.doc, 2,376.50 KB
Attachment:              Valuation_v5.pdf, 16.59 KB
Attachment:         Report v12.doc, 1,062.00 KB
Attachment:              - Range Valued.xls, 23,918.00 KB
Attachment:         Information Request 12 28 06.doc, 41.50 KB
Attachment:         Exhibits v04.xls, 214.50 KB
Attachment          Exhibits v08.xls, 275.50 KB
Attachment:              Exhibits v04.xls, 246.50 KB

**REDACTED**

**From:** ljay@hlhz.com
**Sent:** Monday, April 30, 2007 1:14 PM
**To:** tgwalker@optonline.net
**Subject:** Here's the info

File(s) will be available for downloads until 14 May 2007:

Attachment: FINAL            Sep 2006 Report_11.28.06.pdf, 387.83 KB
Attachment:            Report 9.30 Report_v1.doc, 3,782.50 KB
Attachment: _            Retainer 4.17.07.pdf, 428.29 KB
Attachment:            Sorted by Owner-Open Date vDAs v2.xls, 261.00 KB
Attachment: Landlord listing 4 6 06 with sales vDAs v3_many formats.xls, 3,300.50 KB
Attachment:            PPA Report_v22.pdf, 568.41 KB
Attachment:            PPA Report_v22.doc, 1,616.50 KB
Attachment.            retainer 3.3.06.pdf, 534.56 KB
Attachment:            Retainer Final.pdf, 525.97 KB
Attachment: 2006 Audit Report.pdf, 951.03 KB

**REDACTED**

**From:**          ljay@hlhz.com
**Sent:**          Monday, April 30, 2007 1:48 PM
**To:**            tgwalker@optonline.net
**Subject:**       stuff2

File(s) will be available for downloads until 14 May 2007:

Attachment: <u>v2.xls</u>, 2,059.00 KB
Attachment: <u>Contract Revenue.xls</u>, 225.50 KB
Attachment: <u>Forecast Analysis.xls</u>, 38.00 KB
Attachment: <u>License Fees-Depreciation.xls</u>, 280.00 KB
Attachment: <u>R&D Analysis.xls</u>, 24.00 KB
Attachment: <u>Global Draw Valuation vFINAL.xls</u>, 1,858.00 KB
Attachment: <u>Global Draw.pdf</u>, 21.23 KB
Attachment: <u>Essnet.pdf</u>, 18.55 KB
Attachment: <u>All Other Info From Client files.zip</u>, 10,732.47 KB
Attachment: <u>19.04.06 Disclosure Letter (V.17) Whole (Clean).doc</u>, 918.00 KB

**REDACTED**

**From:**       Jay, Lorre F. [LJay@HLHZ.com]
**Sent:**       Tuesday, May 08, 2007 10:01 AM
**To:**         tgwalker@optonline.net
**Subject:**    FW: Old Presentation List

**Attachments:**    Law Firm Presentations.pdf



Law Firm
resentations.pdf (10

---

**From:**    Berse, Corey
**Sent:**    Monday, May 07, 2007 4:43 PM
**To:**      Fairness Marketing Committee
**Subject:**    Old Presentation List

The last available list...

<<Law Firm Presentations.pdf>>

Corey Berse
*Business Unit Analyst-Financial Advisory Services*
**Houlihan Lokey**
*1930 Century Park West*
*Los Angeles, CA 90067*
*(Direct) 310.712.6595*
*www.hlhz.com*

**From:** ljay@hlhz.com
**Sent:** Friday, May 18, 2007 9:49 AM
**To:** tgwalker@optonline.net

File(s) will be available for downloads until 01 June 2007:

Attachment: subdoc.pdf, 1,381.57 KB
Attachment:        signature.pdf, 5,303.56 KB
Attachment: shareholderagreement.pdf, 2,882.74 KB
Attachment.        signature.pdf, 286.17 KB
Attachment: Second Amended and Restated LLC Agreement of                    - Executed.pdf, 4,587.59 KB
Attachment:                .pdf, 3,690.13 KB
Attachment:        illiquid deal summary.doc, 48.00 KB
Attachment        99_401519_1 (13).DOC, 86.00 KB
Attachment: investor notice2ndclosing2 (7).doc, 39.00 KB
Attachment:                 . Executed.pdf, 3,288.40 KB

**REDACTED**

**From:**                ljay@hlhz.com
**Sent:**               Friday, May 18, 2007 9:54 AM
**To:**                  tgwalker@optonline.net

File(s) will be available for downloads until 01 June 2007:

Attachment: Tab 2 Standard Valuation Opinion.doc, 53.50 KB
Attachment: Tab A Hourly Billing Rates.doc, 24.00 KB
Attachment: Tab B Portfolio Valuation Retainer.doc, 87.00 KB
Attachment: Tab C Impairment Retainer.doc, 95.00 KB
Attachment: Tab D Standard Valuation Retainer.doc, 88.00 KB
Attachment: Tab J Capital Adequacy Retainer.doc, 95.50 KB
Attachment: Tab K PPA Retainer.doc, 96.00 KB
Attachment: Tab L Capital Adequacy Opinion.doc, 70.50 KB
Attachment: Tab O Written Consent for SEC Filling.DOC, 31.00 KB
Attachment: Tab P Certificate Regarding Financial Statements and Projections.doc, 51.00 KB

**From:**    ljay@hlhz.com
**Sent:**    Friday, May 18, 2007 9:55 AM
**To:**    tgwalker@optonline.net

File(s) will be available for downloads until 01 June 2007:

Attachment: <u>Tab Q Confidentiality Agreement HLHZ Receives Information.doc</u>, 55.00 KB
Attachment: <u>Tab R Acknowledgement Letter for Recipients.doc</u>, 41.00 KB
Attachment: <u>Tab T Transactional Opinion Board Package Disclaimers.doc</u>, 39.50 KB
Attachment: <u>Tab U Fairness Retainer (Special Committee).doc</u>, 99.50 KB
Attachment: <u>Tab V Fairness Opinion (Special Committee).doc</u>, 128.00 KB
Attachment: <u>Tab Y Fairness Retainer (Company).doc</u>, 95.00 KB
Attachment: <u>Tab Z Fairness Opinion (Company).doc</u>, 124.00 KB

**From:**        Jay, Lorre F. [LJay@HLHZ.com]
**Sent:**        Friday, May 18, 2007 5:07 PM
**To:**          tgwalker@optonline.net

Attachments:            Trademark Valuation (Draft 4-3-06).pdf;            Trademark Valuation Draft.pdf;
                        Trademark Valuation Final 8.18.06.pdf

    

Trademark
Valuation (D...   Trademark Valuatio..Trademark Valuat...

Lorre F. Jay
Director
Houlihan Lokey
245 Park Ave., 20th Floor
New York, New York  10167
(212) 497-4184 tel
(212) 497-7860 fax
ljay@hlhz.com

**REDACTED**

From:            Jay, Lorre F. [LJay@HLHZ.com]
Sent:            Tuesday, May 22, 2007 3:32 PM
To:              tgwalker@optonline.net
Subject:         info

Attachments:     L Jay Staffing Results Jan 1 06 - Jan 31 07.xls; L Jay updated transaction list.pdf; LJay
                 doc.doc;      2007.pdf; HLHZ Quals for              pdf; Self Assessment - L Jay.pdf;
                 Kevin's roast.doc

                                          
L Jay Staffing    L Jay updated     LJay doc.doc (46    2007.pdf (652    HLHZ Quals for    Self Assessment - L    Kevin's roast.doc
Results Jan 1 0...  transaction list...      KB)           KB)            pd...           Jay.pdf (3...          (32 KB)

Lorre F. Jay
Director
Houlihan Lokey
245 Park Ave., 20th Floor
New York, New York  10167
(212) 497-4184 tel
(212) 497-7860 fax
ljay@hlhz.com

**REDACTED**

**From:**              ljay@hlhz.com
**Sent:**              Tuesday, May 22, 2007 7:18 PM
**To:**                tgwalker@optonline.net


File(s) will be available for downloads until 05 June 2007:

Attachment: Asian option model          pdf, 185.02 KB
Attachment:              warrant.xls, 24.50 KB
Attachment:          summary studies.doc, 510.00 KB
Attachment: Early Stage Company Valuation 81.ppt, 1,640.00 KB
Attachment:      Retainer boiler.pdf, 74.93 KB
Attachment: Fair value measurement Checklist.pdf, 97.36 KB
Attachment: Non-reliance          Form.doc, 27.50 KB
Attachment: Non-reliance form              .doc, 38.50 KB
Attachment: Standard Info Request.doc, 32.00 KB
Attachment: fixed asset data request          htm, 18.30 KB


**REDACTED**

**From:**          ljay@hlhz.com
**Sent:**          Tuesday, May 22, 2007 7:22 PM
**To:**            tgwalker@optonline.net

File(s) will be available for downloads until 05 June 2007:

Attachment: <u>Sample Report</u>      (Intangibles).doc, 531.50 KB
Attachment: <u>Sample Report</u>        .doc, 776.50 KB
Attachment: <u>Sample Report.doc</u>, 713.50 KB

**REDACTED**

**From:**          Jay, Lorre F. [LJay@HLHZ.com]
**Sent:**          Tuesday, May 22, 2007 8:13 PM
**To:**          tgwalker@optonline.net

**Attachments:**    Cost of Being Public 0604.pdf;                 presentation Feb 2004.ppt;
                  doc; HLHZ Termination Fee Study 2003.pdf

   

Cost of Being Public                   HLHZ Termination
0604.pdf ...      presentat...     doc (370 K...   Fee Study 200...

Lorre F. Jay
Director
Houlihan Lokey
245 Park Ave., 20th Floor
New York, New York  10167
(212) 497-4184 tel
(212) 497-7860 fax
ljay@hlhz.com

**REDACTED**

**From:**       Jay, Lorre F. [LJay@HLHZ.com]
**Sent:**       Wednesday, May 23, 2007 9:58 AM
**To:**         tgwalker@optonline.net

**Attachments:**                          Retainer S&W PPA 5-2-07 clean v2.doc;            Retainer S&W Equity
                5-2-07 clean v4.doc;        Retainer S&W      5-2-07.doc; HLHZ Proposal for
                4_25_2007.doc; PPA            Final.doc

            

Retainer S&W PPA..  Retainer S&W Equ..  Retainer S&W Qua..   HLHZ Proposal for        PPA
                                                                                Final.doc (

Lorre F. Jay
Director
Houlihan Lokey
245 Park Ave., 20th Floor
New York, New York  10167
(212) 497-4184 tel
(212) 497-7860 fax
ljay@hlhz.com

**REDACTED**

Exhibit C

## [FORM – DO NOT REVISE]

### CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement") is entered into by Houlihan Lokey Howard & Zukin **[Capital, Inc./Financial Advisors, Inc.]\*\*1\*\*** ("Houlihan Lokey") for the benefit of _____ (the "Company") as of _____ __, 20__.\*\*2\*\*

### RECITALS

A.   The Company may engage, or has engaged, Houlihan Lokey to act in a financial advisory and/or investment banking capacity on behalf of the Company; and

B.   In connection with such potential or actual engagement, the Company may provide Houlihan Lokey with certain information concerning the Company, its affiliates, subsidiaries, officers, directors, shareholders and controlling persons, as well as certain information relating to its business, prospects and customers.

### AGREEMENT

NOW, THEREFORE, in consideration of Houlihan Lokey's receipt of such information, Houlihan Lokey agrees as follows:

1.   As used in this Agreement, "Confidential Information" shall mean all data, reports, financial statements, projections, documents and records containing or otherwise reflecting information concerning the Company, its affiliates, subsidiaries, officers, directors, shareholders and controlling persons, in any form or medium and whether communicated in writing, orally, or otherwise, which is provided to Houlihan Lokey by or on behalf of the Company, together with any analyses, compilations, studies or other documents prepared by the Company, Houlihan Lokey, or other parties which contain or otherwise reflect or are derivative of such information, but does not include information:

   (a)   that was already in Houlihan Lokey's possession, or that was available to Houlihan Lokey on a non-confidential basis, prior to the time of disclosure to Houlihan Lokey;

   (b)   obtained by Houlihan Lokey from a third person which, insofar as is known to Houlihan Lokey, is not subject to any legal, contractual or fiduciary prohibition or obligation against disclosure;

   (c)   which was or is independently developed by Houlihan Lokey without violating its obligations hereunder; or

   (d)   which was or becomes generally available to the public through no fault of Houlihan Lokey or any of its agents, advisors, attorneys, affiliates, employees, subcontractors, officers or directors (collectively, "Representatives").

---

(1)   *Select the appropriate business entity. If at the time of executing the confidentiality agreement you are not sure whether the engagement will be performed by "Financial Advisors, Inc." or "Capital Inc.," please consult with the Legal Department.*

(2)   *If Houlihan Lokey is engaged by an individual (for example, for a valuation of an individual's stock portfolio), certain additional regulatory disclosures will be required. In such case, please contact the legal department for assistance.*

# [FORM – DO NOT REVISE]

2.  Houlihan Lokey agrees:

    (a)    not to disclose in any manner whatsoever all or any part of the Confidential Information, without the prior consent of the Company, except as otherwise expressly set forth herein;

    (b)    not to use the whole or any part of the Confidential Information for any purpose other than in connection with the potential or actual engagement of Houlihan Lokey by the Company;

    (c)    to disclose the Confidential Information only to its Representatives who have a need to know the Confidential Information for the purpose of the potential or actual engagement of Houlihan Lokey, or in connection with services provided by Houlihan Lokey after such engagement, and who have been advised by Houlihan Lokey of the existence of this Agreement and have agreed or are under an obligation not to disclose such information;

    (d)    to ensure that its Representatives act in accordance with the requirements of this paragraph; and

    (e)    to be responsible for any breach of the terms of this Agreement by its Representatives.

3.  Houlihan Lokey will:

    (a)    promptly notify the Company of any request or requirement, arising in connection with any judicial or other proceedings, for Houlihan Lokey to disclose all or any portion of the Confidential Information;

    (b)    refrain from disclosing that Confidential Information until the Company has had a reasonable opportunity to seek an appropriate protective order or other injunctive relief, or has waived Houlihan Lokey's compliance with this Agreement, in connection with such request or requirement; and

    (c)    not oppose an action by the Company to obtain an appropriate protective order or other injunctive relief with respect to such request or requirement, or to obtain other reliable assurances that the Confidential Information will continue to be treated confidentially, all of which shall be at the Company's sole expense.

4.  If:

    (a)    the Company fails to obtain a protective order or other injunctive relief in the manner described in paragraph 3 above; and

    (b)    in the opinion of Houlihan Lokey's legal counsel, Houlihan Lokey is required by applicable law or regulatory authority to disclose such Confidential Information,

Houlihan Lokey may disclose such Confidential Information, but may not disclose any other part thereof.

5.  Houlihan Lokey shall, promptly upon the written request by the Company, return any Confidential Information provided by the Company to Houlihan Lokey that exists in any tangible form, including all copies and notes thereof, except for:

# [FORM – DO NOT REVISE]

    (a)    any analyses, compilations, studies or other documents prepared by Houlihan Lokey or its Representatives based on, containing or reflecting any Confidential Information, which documents shall continue to be held by Houlihan Lokey in confidence, subject to the terms of this Agreement;

    (b)    Confidential Information which Houlihan Lokey certifies in writing has been destroyed;

    (c)    one copy of all Confidential Information furnished to Houlihan Lokey, which information shall be retained by Houlihan Lokey's records management or legal department for archive purposes only (provided that Houlihan Lokey's obligations hereunder shall remain in full force and effect); and

    (d)    Confidential Information which Houlihan Lokey is required to retain in order to satisfy the requirements of any law, regulation or securities exchange rule (provided that Houlihan Lokey's obligations hereunder shall remain in full force and effect).

6.    Houlihan Lokey acknowledges that damages may be inadequate compensation for breach of this Agreement and, subject to the discretion of any court, the Company shall be entitled to seek equitable relief and may restrain, by an injunction or similar remedy, any breach or threatened breach of this Agreement.

7.    This Agreement shall remain in effect for a period of one year**3** from the date hereof.

8.    Whether or not the Company engages Houlihan Lokey, this Agreement will not preclude Houlihan Lokey, or any of its affiliates, from pursuing, investigating, analyzing or engaging in business relationships or transactions (whether as a financial advisor, investment banker, principal or otherwise) which involve the Company, or its affiliates, creditors, equity holders, competitors, suppliers or customers, or other entities engaged in a business which is similar to the business of, or the same industry as, or any other party which may have interests different than or adverse to, the Company, [and that any such activities do not and will not represent any actual or potential conflict of interest on the part of Houlihan Lokey with respect to the matters set forth in this Agreement,]**4** provided that nothing in this paragraph shall be construed in any way to limit the obligations of Houlihan Lokey with respect to the Confidential Information.

9.    This Agreement shall be governed by and construed in accordance with the internal laws of the State of [New York], without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby.**5**

---

(3)   *While a short time frame is clearly preferable, you have some latitude in negotiating this provision if the client objects to the one-year period (i.e., 2 or 3 years).*

(4)   *Consider including the bracketed language for FRG assignments.*

(5)   *If the prospect of being retained is less than certain, the potential client will generally prefer to have his "home state" serve as the governing law. This is permissible, even though the retainer agreement will always refer to New York in the choice of law provision, consistent with past practice.*

**[FORM – DO NOT REVISE]**

Agreed as of the date first written above by:                Accepted as of the date first written above by:

HOULIHAN LOKEY HOWARD & ZUKIN                            _____
[CAPITAL, INC./FINANCIAL ADVISORS, INC.]


By: _____             By: _____
    Name: _____                 Name: _____
    Title: _____                 Title: _____

Exhibit D

**From:**     Jay, Lorre F. [LJay@HLHZ.com]
**Sent:**     Thursday, May 24, 2007 3:14 PM
**To:**       Cyndi Sobe
**Subject:** contact info

Cyndi,

Thanks,  here's my contact interim information 203-561-7983

tgwalker@optonline.net

Best,

Lorre

**From:**    Jay, Lorre F. [LJay@HLHZ.com]
**Sent:**    Thursday, May 24, 2007 2:21 PM
**To:**    Tim Wray
**Subject:** info

Tim,

Thanks again for everything.  Here's the interim contact information.

203-561-7983

Lorre F. Jay
Director
Houlihan Lokey
245 Park Ave., 20th Floor
New York, New York  10167
(212) 497-4184 tel
(212) 497-7860 fax
ljay@hlhz.com

**From:** Jay, Lorre F. [LJay@HLHZ.com]
**Sent:** Thursday, May 24, 2007 2:02 PM
**To:** Csheldon@cantelmedical.com
**Subject:** interim contact information

Let me know if you need anything, Craig.  Nice speaking to you today.

203-561-7983 (cell)

Lorre F. Jay
Director
Houlihan Lokey
245 Park Ave., 20th Floor
New York, New York  10167
(212) 497-4184 tel
(212) 497-7860 fax
ljay@hlhz.com

Exhibit E

**From:** Jay, Lorre F. [LJay@HLHZ.com]
**Sent:** Thursday, May 24, 2007 12:15 PM
**To:** daniel.harris@us.pwc.com
**Subject:** Re:

Dan.

Definitelu would love to talk to your client.  Have him call my cell at 203 561 7983.

Owe you one,

Lorre

-----Original Message-----
From: daniel.harris@us.pwc.com <daniel.harris@us.pwc.com>
To: Jay, Lorre F.
Sent: Thu May 24 07:52:42 2007
Subject: RE:

Lorre,

I have a client that did an acquisition in March - not a significant transaction for them, however, big enough that we would hope they would get a valuation.  If you are okay with it, I will pass your name along to the CFO.  His name is Jeff McAulay.

Thanks,
Dan

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer. PricewaterhouseCoopers LLP is a Delaware limited liability partnership.